(No. 67676

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DOMINGO PEREZ, Appellant.

*Opinion filed March 26, 1992.—Rehearing denied June 1, 1992.*

BILANDIC and HEIPLE, JJ., took no part.

Steven Clark, Assistant Defender, of the Office of the State Appellate Defender, of Chicago, and Monica C. Fitzgerald, law student, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and Richard S. London, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

Following a jury trial in the circuit court of Will County, Domingo Perez, an inmate in the Illinois correctional system, was convicted of the murder of a fellow

inmate, Richard Cook. Pursuant to section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)), the State requested a death penalty hearing, which was held before the same jury that convicted defendant. The jury first found a statutory aggravating factor (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(2)) and then concluded there were no mitigating factors sufficient to preclude a sentence of death (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(g)). Accordingly, the circuit court sentenced defendant to death. On direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 87 Ill. 2d R. 603), defendant's conviction and death sentence were affirmed. (*People v. Perez* (1985), 108 Ill. 2d 70.) A petition for rehearing in this court was denied, and the Supreme Court denied defendant's petition for writ of *certiorari. Perez v. Illinois* (1986), 474 U.S. 1110, 88 L. Ed. 2d 931, 106 S. Ct. 898.

Defendant thereafter filed a petition under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1983, ch. 38, par. 122—1 *et seq.*), and the circuit court appointed counsel to represent defendant. Post-conviction counsel filed an amended petition which alleged the following: (1) defendant received ineffective assistance of counsel at the trial and appellate levels; (2) the Illinois death penalty statute is unconstitutional; and (3) this court failed "to apply principals [*sic*] of State law to [defendant's] case which it has applied to other similarly situated defendants."

The State filed a motion to dismiss and an answer to defendant's amended petition. Defendant responded by filing a memorandum in opposition to the State's motion to dismiss and a supplemental post-conviction petition. After the State filed its answer, the circuit court entered an order denying the State's motion. The court's order also dismissed some of the allegations in defendant's petition, but reserved some for an evidentiary hearing. An evidentiary hearing was held, and the post-conviction

court denied defendant relief. Defendant's appeal from this denial was transferred to this court for direct review pursuant to Supreme Court Rule 651 (134 Ill. 2d R. 651).

On appeal, defendant argues: (1) he received ineffective assistance of counsel due to his counsel's failure to investigate mitigation evidence about his family and his failure to introduce mitigating evidence he possessed; (2) his death sentence is unreasonably disparate from the life sentence of his more culpable codefendant; (3) this court's application of waiver on defendant's direct appeal was inconsistent with other decisions of this court, resulting in violations of due process, equal protection, and the eighth amendment; (4) he was denied effective assistance of counsel at sentencing by counsel's errors and procedural omissions and on appeal by counsel's failure to argue ineffective assistance of trial counsel based on those errors; and (5) the imposition of the death penalty upon a mentally retarded person such as himself is cruel and unusual punishment. We find it unnecessary to address each of defendant's issues, as one allegation of ineffective assistance of counsel stands out and requires us to vacate defendant's sentence and remand the cause for a new sentencing hearing: the failure of defendant's trial counsel to investigate and provide evidence of mitigation at the sentencing hearing.

At the post-conviction hearing, defendant's trial attorney, Daniel Doyle, testified regarding his efforts to garner and present mitigating evidence on behalf of defendant at the second phase of defendant's death penalty hearing. Doyle knew the State would seek the death penalty and that there was a likelihood the trial would proceed to a sentencing hearing involving aggravating and mitigating factors. In October 1982, Doyle looked through defendant's master file at Stateville prison and asked him about his background. Defendant refused to

provide Doyle any information about his family or background at this time. Defendant would not reveal his place of birth, or any information about his parents. Defendant did tell Doyle that he had no brothers or sisters, no relatives, no friends, no visitors, and had no communication with anyone outside the prison. During this questioning, defendant would not speak to Doyle in English. Instead, defendant spoke to Doyle in Spanish through an interpreter. Doyle did not send his court-appointed investigator to search defendant's background for any possible mitigating evidence.

In November 1982, Doyle again questioned defendant about his family. Defendant still refused to reveal any information. Doyle asked defendant about his family several other times and received the same response. Doyle testified that he had no information concerning defendant's family, and specifically denied knowing defendant's parents' names, whether defendant had any brothers or sisters, or defendant's previous addresses. The only thing Doyle knew about defendant's background was that he had lived somewhere in Chicago.

Defendant's trial began June 1, 1983, and ended June 9, 1983. At the trial's conclusion, Doyle asked the court for "sufficient time" to prepare for the sentencing phase. The court set the sentencing date for June 15, 1983. Sometime after June 9, but before June 15 (Doyle's billing record reflects it was June 11, 1983), defendant gave Doyle some information about his background. Defendant wanted the information admitted at the sentencing hearing, but did not want to testify. Doyle used the information to prepare an affidavit. Defendant stated in the affidavit that he had two brothers and one sister, and was the oldest in the family. Defendant further stated that when he was a teenager, his mother and father got into a fight one night when he was asleep, and while he was gone the next day, everyone moved

away. No one told defendant what happened or why until much later. Defendant was on his own at this time and met a priest from the neighborhood who helped him get into a halfway house called "LaFamilia." Defendant later found his father and lived with him for awhile before defendant entered Stateville prison. Since defendant had been in prison, no member of his family had come to visit him, or written him, except for his brother Eddie who contacted defendant in May 1983. Doyle testified that this was the first time he was aware of any of the information contained in the affidavit, except for defendant's birthdate.

On June 14, 1983, defendant gave Doyle information about "La Casa Nostra," a shelter at which defendant had lived. Defendant also told Doyle about a community clinic called "El Rincon," and a priest defendant knew. Defendant wanted Doyle to "look into" these places, and described the area in Chicago using street names. Defendant also gave Doyle some phone numbers he thought Doyle could use to contact these places and the priest. Doyle called the numbers defendant gave him, but obtained no useful information. Doyle never went, or sent the investigator, to Chicago to look for the priest or the area described by defendant. Doyle also did not request any more time from the court to investigate this new evidence.

Doyle acknowledged that defendant's conviction record from 1979 listed defendant's last known address as 1922 W. Division in Chicago. Doyle could not recall whether he had known about this address during the trial.

Defendant, who was not fluent in English, declined to testify on his own behalf at the sentencing hearing. Doyle believed defendant would not testify because he was very embarrassed about his family's abandoning him and not coming to see him in prison. Doyle did attempt

to introduce defendant's affidavit, even though he thought the court would not admit it, because he thought he had no other options available. As expected, the court refused to admit the affidavit into evidence.

Despite defendant's unwillingness to provide any background information, and Doyle's testimony that he had no such information, Doyle did have defendant's school records, which contained information about defendant's childhood and family. Included in these records were two scholastic aptitude reports compiled by qualified school psychologists.

The first scholastic aptitude report, compiled in 1967 when defendant was eight years old, contained defendant's address and telephone number. The report also revealed that defendant was the oldest of three children and that defendant's parents were separated. Defendant's mother, Olga Perez (Mrs. Perez), stated in the report that defendant's father displayed "little concern for his family *** [and s]he never [heard] from him."

The 1967 report also contained results of intelligence tests given to defendant, which revealed a verbal scale IQ of 60, a performance scale IQ of 72, and a full scale IQ of 62. Since defendant's full scale IQ fell below 70, he was classified on the Wechsler Intelligence Scale as "mentally deficient." (D. Wechsler, Manual for the Wechsler Intelligence Scale for Children—Revised 26 (1974).) School test data revealed defendant to be in the bottom 5% of school children his age and rated his chances of difficulty as "high" in first grade work. Defendant's teacher reported that defendant was "an almost constant troublemaker" and his work level and output were "very low." Defendant rarely followed classroom routine, and refused to participate in reading and writing exercises. Defendant also tripped other children, grabbed their crayons, broke things and threw things on the floor. The reporting school psychologist observed:

"defendant seemed rather tense and anxious. He was very slow in responding and had poor verbal ability and a short attention span." When reading material was presented to defendant, he "looked around and acted in a negative, distractible manner. He could recognize no words from a preprimer list." The psychologist concluded that defendant's disruptive classroom behavior resulted from his inability to do the classwork. She recommended placement of defendant in a program for mentally handicapped children (EMH program).

The second scholastic aptitude report, compiled in 1971 when defendant was 11 years old, contained an address and telephone number for the Perez family, which were different than the ones listed in the 1967 report. In this second report, Mrs. Perez indicated that she had been separated from her husband for over two years and had not heard from him during that time. The five members of defendant's family lived in a four-room apartment. Mrs. Perez managed through funds from the Department of Public Aid in the form of Aid to Families with Dependent Children (ADC). Defendant willingly helped with household chores, and had no friends of his own age.

In addition to the earlier intelligence test results from the 1967 report, the 1971 report contained new intelligence tests results. These new results revealed a verbal scale IQ of 70, a performance scale IQ of 90, and a full scale IQ of 77, which placed defendant in a category known as "borderline," between "mentally deficient" and "low average (dull)." (D. Wechsler, Manual for the Wechsler Intelligence Scale for Children—Revised 26 (1974).) The psychologist reported:

> "Although [defendant] appeared to cooperate to the best of his ability, he was slow to respond and at times required some encouragement. This boy appears to have

considerable difficulty with tasks involving conceptualization."

The psychologist recommended defendant's continued participation in an EMH program, noting in particular defendant's low verbal scale score . and the fact that defendant had already benefited from the program. There was no indication in this report that defendant was a disruptive force in the EMH classroom.

Although Doyle had these school progress records, and had in fact used them as exhibits during an earlier proceeding to determine whether defendant understood English, Doyle did not introduce the records at defendant's death penalty hearing. Doyle acknowledged there was mitigating information in the records, but thought he failed to introduce them because defendant did not want any information about himself or his family used in the proceedings. Doyle could not say that defendant told him not to use the school records.

Doyle later testified that he could not recall why he had not sought the record's admission, but speculated that he must have concluded that the characterization in the 1967 report of defendant as a "troublemaker" when he was eight years old outweighed the mitigating information that report provided. Doyle could not explain why he failed to introduce the 1971 report, which, unlike the 1967 report, did not contain the information that defendant was a troublemaker. Concerning the results of the WISC standardized tests revealing defendant to be mentally deficient, Doyle could not say he understood what they were at the time of the death penalty hearing, and did not present the results to anyone to interpret for him.

Doyle *did* introduce at sentencing a copy of a psychological report written shortly after defendant's incarceration in the Department of Corrections for an armed robbery conviction. The report, evincing an examination

conducted by a Department of Corrections psychologist, Dennis Becraft, did contain some mitigating evidence:

> "[Defendant] impresses as somewhat emotionally disturbed and alcohol dependent as a result of attempting to escape this disturbance. The emotional problems revolve around rejection by his family which was disintegrated, leaving him with no support or knowledge of their whereabouts."

The report, however, contained much more that was damaging to defendant's case. For example, Becraft observed: "[defendant is] *aggressive, criminally-oriented, and a member of the Latin Kings organization. He is likely to become quickly institutionalized with high likelihood of recidivism.*" (Emphasis added.) Becraft perceived defendant as "basically uncommunicative" and noted that defendant "was often attending poorly to the interview." Becreaft's report also noted that defendant felt he had damaged his brain through drug abuse, and concluded defendant was *"likely to adjust inadequately to incarceration due to gang activities."* (Emphasis added.)

Doyle called Becraft to testify at the sentencing hearing, but did not examine him concerning the report's contents. Instead, Doyle only used Becraft to lay the foundation for the report. The State, however, cross-examined Becraft about the aggravating evidence in the report.

Following post-conviction counsel's questioning of Doyle, the court conducted its own limited questioning of Doyle. The court noted that Doyle had once moved orally to withdraw as counsel for defendant because of a disagreement with defendant. The following exchange was then initiated by the court:

> "THE COURT: [Was] there ever a time when you made a motion saying that Mr. Perez wouldn't cooperate with you and wouldn't give you information, wouldn't

participate in his defense, and did you ever make any kind of motion like that?

MR. DOYLE: I can't recall, Judge, honestly.

THE COURT: Okay. Do you recall whether or not there was ever a motion, a competency type of motion having to do with his competency to assist in his defense due to these communications problems that you were having with him, where he was reticent and wouldn't tell you things and wouldn't come forward with any information, any motion like that?

MR. DOYLE: There was the hearing that was held, I believe it was in May, about understanding the English language. That is when a lot of that came out. I think it was May. I am not sure about the date, though.

THE COURT: All right, okay. But there was no formal, there was no type of competency hearing where there was anything having to do with his mental ability to cooperate with you, like where you would have a couple of psychiatrists or psychologists appointed to examine him?

MR. DOYLE: No, there was never any psychiatrist for that reason.

THE COURT: All right. Okay. That is all the questions the Court has."

The next witness to testify was Harold Barnes, a protective services investigator for the Illinois Department of Children and Family Services. Barnes had been enlisted by post-conviction counsel to investigate defendant's background. Barnes initiated his investigation by speaking extensively with defendant, after which Barnes contacted Mrs. Perez, and his brothers and sister. He also reviewed prison and school records. Barnes testified that the procedures he employed were those customarily followed in his profession.

Barnes learned that defendant's family consisted of his mother, father, two brothers, and a sister. Defendant's father was a factory worker throughout most of his life, and his mother was a homemaker. Defendant's fa-

ther dominated the Perezes' chaotic home life. Defendant's brother Eddie told Barnes:

> "[Their father] was actively involved in drug selling. He brought drugs into the house. We're talking about either it was cocaine or heroin. In fact he free based in the house. He bought marijuana. He bought handguns, we're talking about rifles, shotguns, small handguns. He sold them. Both drugs and guns. My father was a role model. He was much more a role model to my older brother (Domingo) than anything else. My father was into drugs, and Domingo got into drugs as well. Domingo began using drugs because it was there (in the house). He knew my father was selling drugs and initially that's how he got into using marijuana. My father was also an alcoholic. He used to come in drunk and tear up the house. He was very abusive, a very abusive man. Our every day to day life was living in fear not knowing every day that he would come in, whether or not he was drunk or not and whether or not he'd be abusive. My father was very abusive to my mother. We (Domingo, Eddie, and Juana) tried to stop him several times, but of course we were no match for this man. We'd just get slapped across the face and get punched. He'd rip off electrical cords, actually off an appliance and he'd start hitting us with them. He'd throw things at us. Once he grabbed my sister and knocked her against the wall and cut her open. This is the type of man that he was, coming into the house like that. My father was physically abusive to all of us. We wouldn't laugh around the house when my father was there because if we'd laugh, we might get it depending on his moods. There used to be times when my father would yell at Carlos and I'd laugh about it and I'd get whipped. I mean whipped. Not just slapped. I mean whipped. This was the kind of life we were living on a day to day basis. I don't know how much money he spent on furniture either. He has torn up so much furniture it's unbelievable, coming into the house and just tearing everything apart. I mean he'd take out his knife and just start tearing, tearing everything."

Mrs. Perez told Barnes that, as a child, defendant had difficulty in school. However, defendant did make progress when a teacher at a "special school" took an interest in him. In 1975, Mrs. Perez fled with her children to New York to escape defendant's abusive father. Mrs. Perez was concerned about the influence her husband was having on defendant. Mrs. Perez returned to Chicago with her younger children after approximately four to six months. Defendant and his grandmother returned to Chicago two months later. Defendant's father was not informed of their whereabouts.

Mrs. Perez noticed that defendant had changed once he was in New York and away from his father. When defendant returned to Chicago, he got a job at a grocery store and regularly contributed toward maintenance of the family. Defendant's family accepted him as a productive member. His job afforded him a degree of confidence, self-esteem and hopes of success. For the first time in defendant's life, he was achieving, and he responded in a very positive manner. At this time, defendant was 16 years old. He had dropped out of high school in his freshman year.

According to Barnes, defendant was eventually dismissed from his job because of his inadequate reading skills. Defendant could not read the labels on grocery items. Around the same time, defendant witnessed the shooting death of a close friend. These two things, the loss of his job and friend, greatly affected defendant. Defendant could not find another job and, after awhile, became resigned to the fact that he was not going to find work. Defendant began to stay out late at night, smoking marijuana and drinking. He came into contact with members of the Latin Kings street gang.

Another factor contributed to defendant's change of behavior. Defendant's grandmother became increasingly

antagonistic toward him, primarily because he was not bringing in any money. At her mother's urging, Mrs. Perez decided to abandon defendant because she feared he would contact his father and inform him of the family's whereabouts. She also felt defendant was a bad influence on the younger children. The family thus moved out of their residence one day when defendant was away. Defendant knew nothing of the family's departure until he returned to the empty residence. Mrs. Perez severed all ties with defendant. In fact, Mrs. Perez took steps to make sure defendant would not find her, going so far as to ask Father John Kathrein, a priest at her children's previous school, not to tell defendant where she and her family were.

After she abandoned defendant, Mrs. Perez learned, through a contact in the neighborhood, that her son was living wherever he could find shelter. Kathrein helped defendant get into a halfway house called "La Casa Nostra." About three months after defendant had been abandoned, he persuaded Kathrein to contact his mother by telephone and plead his case. According to Barnes, defendant begged Kathrein to phone his mother and tell her that he was sorry, would behave himself, and would not get into any trouble if she would allow him to return home. Mrs. Perez refused to have any contact with defendant and subsequently learned that defendant was no longer "hanging around" the neighborhood. Mrs. Perez lost all contact with defendant.

When defendant realized that he would not be able to locate his family, he moved out of the halfway house and moved in with his father, with whom he had reestablished contact. Defendant's reconciliation with his father was short-lived. On December 20, 1978, Mr. Perez ejected defendant from his house and told him not to return. On that day, defendant "ran into" a friend, Freddy Ramos, went to an "El" station, and committed an

armed robbery. Defendant was armed with scissors, and Ramos had "some kind of pipe." Defendant said he committed the robbery "to get money to find some place to live and to buy marijuana." Defendant and Ramos were immediately apprehended by a police officer who witnessed the robbery. Defendant was approximately 18 years old at the time of the robbery, and 19 years old in 1979 when he entered the correctional system. Defendant has been incarcerated ever since.

Barnes further testified that defendant denied he had been an initiated member of the Latin Kings prior to incarceration. However, defendant admitted he knew members of the Latin Kings who were inmates at Stateville Correctional Center, and he associated with them, hoping for some degree of protection. After approximately one year in prison, defendant decided to join the Latin Kings, purportedly for protection. Defendant's behavior began to markedly deteriorate after eight months of incarceration. For the next five years, defendant had no contacts outside of the prison community. It was during this period of time that defendant participated in the murder of rival gang member Richard Cook.

In 1983, after defendant had been charged with Cook's murder, defendant's brother, Eddie Perez, began to look for defendant. Eddie and a co-worker theorized that defendant might have been arrested. Acting upon that assumption, the two located defendant at the Menard Correctional Center. After Eddie found defendant, family members began to visit him, write him letters, and speak to him by telephone.

Barnes testified that the intervention of a social worker might have altered the course of events after defendant was incarcerated by giving him someone to relate to "other than being forced into [the] society of the Latin Kings." Barnes described defendant as a "depen-

dent personality, a person who has responded to the few overtures that have been presented to him."

Barnes acknowledged that he had spoken extensively with defendant during the course of his investigation and had been able to contact Mrs. Perez because post-conviction counsel had given him her phone number and address. Starting with Mrs. Perez, Barnes had then contacted the other family members. Although defendant gave Barnes some background information, Barnes said it was necessary to talk to the members of defendant's family. According to Barnes, defendant could not recall many things, and perhaps did not want to discuss certain things with him.

Next to testify at the post-conviction hearing was Andrea Lyon, an attorney with the Cook County public defender's office, and an expert on death penalty litigation. Lyon was called as a witness on defendant's behalf. Lyon, a member of the National Criminal Defense College, had personally tried about 30 capital cases, 12 of which went to death penalty hearings. None of Lyon's clients received the death penalty. Lyon also teaches classes on the death penalty, conducts death penalty seminars in Illinois and throughout the country, has written the Illinois Death Penalty Defense manual, and has published articles in magazines concerning the death penalty.

According to Lyon, many attorneys fail to conduct adequate investigations for potentially mitigating evidence. Lyon believes no attorney should try a capital case alone. An attorney defending a capital case should start his or her investigation into mitigation the same day the case is received, and all available records should be examined at the outset. Next, the attorney should talk to persons mentioned in the records. Lyon considered consultation with the client "extremely important." Experts such as neurologists, psychiatrists, sociologists

and social workers should be consulted, where indicated, with a view to "putting together all [the] pieces into some kind of psychological or sociological picture [of defendant]."

Lyon said it is a very common problem in death penalty cases to have an uncooperative client. Some clients refuse to talk to their attorneys because they are afraid; others refuse to talk in order to protect family or friends. In such an instance, Lyon testified, the attorney should gather as much specific information as possible from other sources, and approach the client with the information. Even if a client does not want his family involved, his lawyer should go and find the family anyway. Lyon stated her belief that an attorney has "a duty both legally and morally *** to test the system" and adduce mitigating evidence notwithstanding his or her client's instructions to the contrary. In certain cases, the services of an expert may be useful to help understand a recalcitrant client and to obtain information. The expert may succeed where the attorney cannot.

Following Lyon's testimony, the circuit court heard arguments from both sides and took the matter under advisement. On July 21, 1988, the court rendered its decision.

The circuit court directed its comments to Doyle's representation of defendant at the second phase of the death penalty proceeding, the focus of the evidentiary hearing:

"The crux of the problem has to do with the evidence in mitigation or lack of evidence in mitigation that was put in the case. And there is no question from the record that there was very little evidence put into the record before this jury that was mitigating, and so that the result was that Mr. Perez, convicted of murder and the jury having properly found the proper aggravating factor,

there being very little in mitigation, Mr. Perez wound up sentenced to death."

Notwithstanding a dearth of mitigating evidence at the sentencing phase of trial (Becraft's report was the only evidence Doyle presented that was admitted; the State even argued there was no mitigating evidence), the court attributed the lack of mitigating evidence to defendant's recalcitrance, rather than defense counsel's ineffectiveness. The court noted that defendant had "insisted that his family, that his background, that his rather difficult childhood not be used in any way in [the] proceedings." The court also found defendant's lack of cooperation to be "a very important factor" in the case. The court decided Doyle was not ineffective in failing to pursue or introduce evidence of defendant's family background in light of the obstacles he faced. The court also believed that Doyle was under no obligation to send the investigator to search defendant's background for any mitigating evidence. Concerning defendant's school records, the court noted that while they were available, did contain some mitigating evidence, and probably should have been introduced, the failure to introduce them did not affect the reliability of the verdict. The court concluded:

> "[W]hile the Court is of the opinion that [defendant] did not have perhaps a perfect trial, the Court believes that much of it was due to his own fault, and the Court believes that there is nothing in the area of ineffective assistance of counsel that rises to the level of depriving him of his Sixth Amendment right to counsel."

We disagree with the trial court's conclusion, and find two errors on Doyle's part which require us to vacate defendant's sentence and remand for a new sentencing hearing: (1) Doyle's failure to investigate and present to the jury evidence of defendant's mental history; and (2) Doyle's failure to make even a minimal search into

defendant's background with the information he possessed.

The test for ineffective assistance of counsel was provided in the Supreme Court decision *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. This court, in *People v. Franklin* (1990), 135 Ill. 2d 78, discussed the test for ineffective assistance of counsel and set forth what a defendant must show to prevail on such a claim:

> "(1) that his counsel's performance was so deficient as to fall below an objective standard of reasonableness under 'prevailing professional norms'; and (2) that the deficient performance so prejudiced the defense as to deny the defendant a fair trial. [Citation.] To establish the deficiency of counsel's performance, the defendant must overcome the 'strong presumption' that his counsel's representation fell within the 'wide range of reasonable professional assistance.' [Citation.] As such, 'strategic choices made after *thorough investigation* of law and facts relevant to plausible options are virtually unchallengeable.'" (Emphasis added.) *Franklin*, 135 Ill. 2d at 116-17, quoting *Strickland*, 466 U.S. at 687-88, 689, 80 L. Ed. 2d at 693-94, 95, 104 S. Ct. at 2064-65, 2066.

Failure to present mitigating evidence at a capital sentencing hearing does not in itself prove that a defense attorney was ineffective. (*People v. Jones* (1991), 144 Ill. 2d 242, 278; *Burger v. Kemp* (1987), 483 U.S. 776, 97 L. Ed. 2d 638, 107 S. Ct. 3114.) In certain cases, mitigating evidence may be so flawed or potentially damaging to the defendant that competent counsel would make a strategic choice not to present it. In such cases, "we must presume that it was these drawbacks, and not merely lack of diligence, which was behind counsel's decision." (*People v. Caballero* (1989), 126 Ill. 2d 248, 275.) In this case, however, we find that it was Doyle's lack of diligence, rather than any drawback or strategy, which

prevented him from introducing important mitigating evidence.

## I

### Whether Counsel's Actions Fell Below an Objective Standard of Reasonableness Under Prevailing Professional Norms

### A

*Failure to Investigate and Present to the Sentencing Jury Evidence of Defendant's Mental History*

Doyle had in his possession at the time of the sentencing hearing defendant's school records, which revealed that defendant was mentally deficient and was placed in special classes for the educably mentally handicapped. Yet, Doyle failed to present this important mitigating evidence to the sentencing jury. We find no reasonable explanation for Doyle's actions, and conclude that his failure to present the evidence to the sentencing jury was not the product of a thorough investigation, but rather of ignorance of the information, and thus not a strategic decision.

At the post-conviction hearing, Doyle testified that he failed to use defendant's school records at the sentencing hearing because defendant would not allow him to use any information about his family or background in the proceedings. The State argues that this testimony reveals a reasonable decision on Doyle's part not to use the school records. This testimony, however, is inconsistent with other testimony Doyle gave at the post-conviction hearing and with his actions at the sentencing hearing. Specifically, Doyle testified that defendant eventually did give him information about his family which he wanted admitted at the sentencing hearing in the form of an affidavit. Defendant also gave Doyle in-

formation about a shelter, a clinic, and a priest, and gave him phone numbers and street names for Doyle to "look into." This clearly indicates that defendant had allowed Doyle to use information about his background and family at the sentencing hearing. Furthermore, Doyle argued for the admission of defendant's affidavit, which contained information about defendant's family and background, and introduced Becraft's report which also contained such information. It thus cannot be said that Doyle failed to use the information contained in the school records concerning defendant's mental history because defendant instructed him not to use any information about his family or background.

Doyle later testified that he could not explain why he had not used the school records, but stated that if he had to guess, it was because the records labeled defendant a "troublemaker." The State argues this testimony shows Doyle made a reasonable strategic decision not to introduce the school records. We disagree for several reasons. While the 1967 report stated that defendant was a troublemaker, it also explained why he was a troublemaker: defendant was unable to perform work at his grade level because of his mental handicap. Moreover, the 1971 report did not state that defendant was a troublemaker in class, but did contain the results of defendant's intelligence tests as well as other mitigating evidence. Doyle could not explain why he failed to introduce the 1971 report. Additionally, if Doyle had read both reports together, he would have known that while defendant may have been a troublemaker in regular school classes in 1967 due to his mental handicap, once he was placed in the EMH program, he "cooperated to the best of his ability."

We further discount Doyle's "troublemaker" rationale for not using the school records because Doyle did introduce Becraft's report at the sentencing hearing, a report

which contained a much greater amount of aggravating evidence ("[defendant is] aggressive, criminally oriented, *** likely to become quickly institutionalized with high likelihood of recidivism *** and likely to adjust inadequately to incarceration due to gang activities") than the 1967 school records, which only described defendant as a "troublemaker." And, as previously noted, the 1971 report did not even contain this information about defendant's classroom behavior. We fail to see any reasonable strategic choice by Doyle in using Becraft's report for its minimal mitigating evidence, rather than using the school reports for information concerning defendant's mental history.

We conclude that Doyle was unaware of the school reports' contents at the time of the sentencing hearing, and thus failed to properly investigate and use the information contained in the school records. Several other factors have led us to this conclusion. First, Doyle testified that he could not say whether he understood the meaning of the intelligence test results in the school reports at the time of the sentencing hearing, and did not have anyone interpret them for him. Doyle also claimed he knew nothing about defendant's family until defendant gave him information for the affidavit, even though the school records contained quite a bit of family information. Finally, Doyle testified that he argued for the admission of defendant's affidavit at the sentencing hearing for the mitigating information it contained, even though he knew it would not be admitted, because he had no other option at that time. Obviously, Doyle did not consider the school reports an option.

We also find troubling the fact that Doyle did not seek any independent expert testing of defendant when he should have been aware of defendant's mental deficiency. This failure to seek expert assistance is especially troubling in light of the fact that Doyle was having com-

munication problems with defendant. As Lyon testified, experts may be needed in cases of recalcitrant defendants to determine why they will not cooperate with their attorney. Doyle took no steps to understand this problem.

Because Doyle failed to investigate defendant's mental history, his decision not to present such evidence to the sentencing jury cannot be deemed a strategic decision. Our decision is supported by a line of Federal cases in which counsels' failure to investigate and present defendants' mental histories was found to fall below objective standards of reasonableness and constitute ineffective assistance of counsel.

In *Brewer v. Aiken* (7th Cir. 1991), 935 F.2d 850, 857, the court held:

> "In our opinion, defense counsel's failure to investigate the mental history of a defendant with low intelligence demonstrates conclusively that he did not 'make a significant effort, based on reasonable investigation and logical argument, to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors.'" (Quoting *Kubat v. Thieret* (7th Cir. 1989), 867 F.2d 351, 369.)

The court in *Aiken* further noted that counsel's failure to investigate and present evidence of the defendant's mental history was even more serious in light of a court-appointed psychologist's testimony that the defendant had a dependent personality and was easily led by others. The same is true here, as Barnes testified that defendant had a dependent personality and responded to the few overtures presented to him, and evidence existed that defendant's codefendant, Hector Rivera, was a leader in the Latin Kings organization and most likely ordered the killing of Cook. Doyle did not introduce any of this evidence.

Another decision, *Cunningham v. Zant* (11th Cir. 1991), 928 F.2d 1006, dealt with counsel's failure to present evidence of a defendant's mild mental retardation to the jury. There, the court held:

> "Trial counsel did not recall that the Central State Hospital personnel had diagnosed Cunningham to be mildly mentally retarded. Accordingly, their decision not to present such evidence cannot be deemed tactical." (*Cunningham*, 928 F.2d at 1018.)

Here, Doyle could not recall whether he understood the meaning of defendant's test scores at the time of the sentencing hearing and did not have anyone interpret them for him. Thus, his decision not to present such evidence to the jury cannot be deemed tactical.

In *Stephens v. Kemp* (11th Cir. 1988), 846 F.2d 642, the court stated: "[T]rial counsel's failure to investigate, present and argue to the jury at sentencing any evidence of appellant's mental history and condition constituted error 'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' [Citation.]" (*Stephens*, 846 F.2d at 652.) And, in *Evans v. Lewis* (9th Cir. 1988), 855 F.2d 631, the court found counsel's failure to investigate defendant's mental health, when he had evidence of mental illness, an important factor in finding the ineffective assistance of counsel.

We conclude that Doyle's failure to investigate and present to the jury defendant's mental history fell below objective standards of reasonableness under prevailing professional norms.

## B

### *Failure to Investigate Defendant's Background*

We next address Doyle's failure to investigate defendant's background with the information Doyle possessed,

and conclude that this failure also fell below an objective standard of reasonableness under prevailing professional norms. Doyle claimed that he failed to investigate defendant's background because defendant would not give him any information. As a result, Doyle believed he had no information about defendant to investigate. Doyle specifically denied knowing any information about defendant's mother or father, or knowing whether defendant had any brothers or sisters until defendant gave him the information during the preparation of the affidavit just prior to sentencing. However, Doyle did have defendant's school records which contained family information such as his mother's name, his sister's name, his brother's name, addresses and telephone numbers from the time the reports were compiled, the fact that the family was on ADC, the names of defendant's schools, his teachers' initials, and the names of the qualified school psychologists who prepared the reports. The reports also stated that defendant's father had abandoned the family and shown little concern for their welfare. In addition to the school records, Doyle had defendant's 1979 conviction record, which contained his last known address prior to incarceration, and defendant's birth certificate, which contained both his mother's and father's names. Doyle, however, failed to investigate any of this information or send his court-appointed investigator to investigate any of this for mitigating information.

We are unable to discern any strategy developed by Doyle which would entail not investigating the only information he had concerning defendant's background. We find that Doyle's failure to investigate was the result of ignorance of the family information contained in the various records he possessed. Doyle thus did not make a thorough investigation of defendant's background for mitigating evidence. In concluding this, we acknowledge that Doyle was in a difficult situation due to defendant's

recalcitrance. However, as Lyon testified, a recalcitrant defendant is a very common problem in capital cases, and there are ways to solve this problem. In such a situation, an attorney could search for as much information about a defendant as he can and confront the defendant with it (see *Mitchell v. Kemp* (11th Cir. 1985), 762 F.2d 886 (where defendant told counsel not to use his family and court found it important that counsel ignored this and contacted defendant's father anyway)) or have an expert examine the defendant and attempt to understand his recalcitrance. Doyle did none of this, despite defendant's history of mental deficiency and Becraft's report indicating defendant's family had abandoned him, which should have alerted Doyle to possible reasons behind defendant's unwillingness to provide information.

We further note that Doyle's failure to investigate defendant's background with the information he possessed is more troubling in light of the fact that defendant opened up a bit prior to the sentencing hearing and did in fact give Doyle information to investigate. "[E]very advocate and counselor should be aware that the emotional and psychological stress accompanying the intense confrontational drama of a capital trial distorts reactions and affects decisions. It is not unusual for clients in all kinds of cases to be unshakeably adamant in their views at first, only to change their minds later, when time and trust in counsel cause them to perceive matters differently." (Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 322 (1983).) A thorough investigation by Doyle of the information available to him previously could have facilitated an investigation into the information defendant did eventually provide. Instead, Doyle simply made a few telephone calls, found nothing helpful, and gave up. Doyle did not travel to Chicago, or even send his investigator, to look into the information.

Doyle also did not inform the court of his situation, or request a continuance to investigate the new information.

We conclude that defendant has satisfied the first prong of the *Strickland* analysis by showing Doyle's failure to investigate and present defendant's mental history to the jury, and Doyle's failure to investigate defendant's background with the information he had.

## II

### Whether Counsel's Deficient Performance So Prejudiced the Defense as to Deny Defendant a Fair Sentencing Hearing

We must now determine whether the second prong of the *Strickland* analysis is met, that is, whether Doyle's deficient performance so prejudiced the defense as to deny defendant a fair sentencing hearing. We conclude that it did.

Mitigating evidence is extremely important under the Illinois capital sentencing scheme. Once an aggravating factor is found sufficient to impose the death penalty, there must be mitigating evidence sufficient to preclude the imposition of the death penalty. The jury's decision must be unanimous, meaning that defense counsel need only convince one juror that enough mitigating evidence exists to preclude the imposition of the death penalty. (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(b)(2), (g).) The minimal amount of mitigating evidence presented at defendant's sentencing hearing was contained in Becraft's report, which also contained a much greater amount of aggravating evidence. Yet, a great deal of mitigating evidence existed which Doyle failed to investigate and introduce.

The resulting prejudice to defendant is clear. Had Doyle known of and understood the information con-

tained in the school report, and investigated defendant's mental history, he could have introduced a great deal of mitigating evidence. At the same time, Doyle would not have had to introduce Becraft's report. Such an investigation could also have indicated to Doyle that perhaps he needed an expert to examine defendant and help Doyle communicate better with defendant. Moreover, a thorough investigation of the family information contained in the school reports and other information could very well have assisted Doyle in investigating the information defendant finally gave him just prior to sentencing. These errors, especially when considered together, raise a serious doubt as to the reliability of defendant's sentencing.

While the State argues that the mitigating evidence Doyle might have introduced could just as well be considered aggravating, we find that the mitigating nature of the evidence far outweighs the negatives contained in the evidence. The State, in particular, notes defendant's poor school performance, his prior drug use, and the fact that his family took active steps to avoid him. However, defendant's poor school performance is explained greatly by his mental handicap, and his prior drug use was, to a great extent, the result of living with his abusive father, who bought, sold, and used drugs in the Perez household. The fact that defendant's family abandoned him was a direct result of his mental handicap, drug use, and the family's fear of his abusive father. We thus believe there is the reasonable probability that had the jury known of the evidence Doyle failed to investigate and present, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 80 L. Ed. 2d at 698, 204 S. Ct. at 2069.

We conclude that defendant did not receive the individualized sentencing determination that the Constitu-

196

tion requires. (*Eddings v. Oklahoma* (1982), 455 U.S. 104, 112, 71 L. Ed. 2d 1, 9, 102 S. Ct. 869, 875.) We therefore vacate defendant's capital sentence and remand the cause to the circuit court for a new sentencing hearing. This decision in no way affects the finding of defendant's guilt; therefore, we affirm defendant's conviction.

*Conviction affirmed;*
*sentence vacated;*
*cause remanded.*

JUSTICES BILANDIC and HEIPLE took no part in the consideration or decision of this case.