2021 IL App (2d) 181032-U
No. 2-18-1032
Order filed March 26, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-DT-326 |
| CHRISTOPHER GARCIA, | ) ) | Honorable Robert K. Villa, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Zenoff and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant received ineffective assistance of trial counsel. We reverse his conviction and remand for a new trial.

¶ 2   In 2017, in his first direct appeal, this court agreed with defendant, Christopher Garcia, that his conviction for driving under the influence of alcohol (DUI) (625 ILCS 5/11-501(a)(2) (West 2012)), must be reversed and the cause remanded, because he had been improperly precluded from presenting a defense that his behavior on the night in question was due to mental illness, not alcohol consumption. *People v. Garcia*, 2017 IL App (2d) 141184-U, ¶ 41. Defendant was again convicted upon retrial, and at issue in the present appeal is whether defense counsel provided

ineffective assistance where he failed to introduce evidence concerning defendant's bipolar-disorder diagnosis. For the following reasons, we agree that defendant received ineffective assistance of counsel, and we reverse and remand for a new trial.

¶ 3                           I. BACKGROUND

¶ 4                        A. First Trial and Appeal

¶ 5      The facts presented at defendant's first trial are thoroughly detailed in our earlier decision (*Garcia*, 2017 IL App (2d) 141184-U, ¶¶ 2-23), but we summarize that, on March 31, 2013, defendant was speeding and drove through two stop signs. After stopping defendant, officers helped him out of the car and he immediately went limp and fell to the ground. Defendant provided inconsistent explanations for his erratic driving, and the officers observed that defendant's eyes were red, bloodshot, and glassy; his speech was slurred; and a strong odor of alcohol was emanating from defendant's breath. Defendant declined the officers' request that he perform field-sobriety tests. After being handcuffed, while awaiting transport to the police station, defendant became belligerent and aggressive, and he began "free-style rapping" and talking nonsense. When police inventoried defendant's car, they discovered an uncapped, three-fourths-full bottle of Hennessy cognac standing up on the front-passenger seat. The bottle and its contents were not preserved or tested and were unaccounted for at trial.

¶ 6      At the police station, when receiving the warning to motorists, defendant screamed throughout the entire warning and threatened to kick the officer and other jail personnel in their throats. Defendant refused Breathalyzer and blood tests. When escorted to a jail cell, defendant again made his body go limp. At least one officer had prior contact with defendant and knew him to be mentally unstable and suicidal. However, the officers testified that, based upon their professional and personal experiences observing people under the influence of alcohol, defendant

was "very intoxicated" and not fit to drive. Specifically, the officers based their opinions on defendant's erratic behavior and the facts that defendant: was speeding; failed to stop at two stop signs; failed to yield to an emergency vehicle; changed his story a number of times when asked where he was going; had difficulty standing; had red, bloodshot, and glassy eyes; smelled of alcohol; slurred his speech; and refused to take any field sobriety tests. One officer testified that, when he had encountered defendant in the past, defendant did not slur his speech, smell like alcohol, or have red, bloodshot, and glassy eyes.

¶ 7    At trial, defendant sought to introduce evidence that mental-health problems, not alcohol consumption, were the source of his strange behavior. For example, defendant wished to present testimony from Officer Jason Sheldon that, while in his cell, defendant removed his clothes, flooded his cell, and threw his underwear and possibly used toilet paper at the camera in his cell. In addition, defendant anticipated that Sheldon would testify about defendant's agitated state and his attempt to kill himself by hitting his head on the wall. Accordingly, and because Sheldon knew that defendant had attempted suicide in the past, defendant was ultimately transported to Provena Mercy Medical Center (Mercy). Defendant explained that, at Mercy, he was treated by Dr. Marc Crescenzo who, after talking with a psychiatrist, diagnosed defendant with bipolar disorder. For a variety of reasons, the court ultimately did not allow Sheldon or Dr. Crescenzo to testify, did not allow defendant to present offers of proof concerning their testimony, and did not allow defendant to show a video of his behavior in the police station.[1] As noted, defendant was convicted of DUI. The trial court denied his posttrial motion and sentenced him to 180 days in jail.

---

[1] Upon review, this court summarized the video as showing "defendant fully clothed and being processed; taking off all of his clothes in booking except for his underwear, presumably at

¶ 8 On appeal, defendant argued that the court improperly excluded evidence suggesting that his continued odd behavior (behavior that the officers considered in concluding that he had committed DUI) was attributable to his alleged bipolar disorder, not intoxication, including: (1) testimony from jail personnel who saw defendant at the police station after he was arrested; (2) surveillance video showing defendant's behavior at the police station; and (3) testimony of Mercy medical staff who observed, treated, and diagnosed defendant with bipolar disorder on the day he was arrested for DUI.

¶ 9 This court agreed. We noted, in part, "[n]othing in the offer of proof [submitted in support of defendant's posttrial motion] indicated that any witness would have been able to testify that the specific behavior the officers observed could have been caused by defendant's bipolar disorder. Rather, each witness would have described the strange behavior that he or she observed defendant exhibit[.]" *Id.* ¶ 22. Further, we would not "comment on defendant's arguments concerning [Dr.] Crescenzo's ability to offer expert testimony about defendant's bipolar disorder." *Id.* ¶ 36. However, we determined that many of the State's arguments concerned the weight of the evidence, not its admissibility. *Id.* ¶¶ 32, 35-39. Moreover, we noted:

"[t]he fact that the evidence was remote, *i.e.*, that defendant's erratic behavior continued hours after any alcohol would have been eliminated from his system, is precisely why defendant contends that it is relevant to his claim that his bizarre behavior was caused by

the officers' request; going limp as the officers are transporting him to his cell; flooding his cell; taking off his underwear in his cell; throwing his underwear at the camera along with wet and possibly soiled toilet paper; masturbating; pacing around the cell; doing handstands while naked; and banging his head on a cement bench in his cell." *Garcia*, 2017 IL App (2d) 141184-U, ¶ 19.

his mental illness rather than intoxication. That is, because a mental illness, unlike intoxication, does not dissipate over time, the fact that defendant was behaving strangely hours after his arrest becomes probative of whether alcohol consumption or a mental illness caused defendant to behave in such a manner that the police believed that he was intoxicated to such a degree that his driving was impaired." *Id.* ¶ 37.

We reversed and remanded for a new trial. *Id.* ¶ 41.

¶ 10                                B. Second Trial

¶ 11    In sum, much of the evidence about the events of March 31, 2013, was reintroduced on remand. This time, however, defense counsel introduced evidence from two of the categories addressed in this court's decision: (1) Sheldon's testimony; and (2) the video of defendant's behavior in the station. However, defense counsel did not offer evidence regarding the *third* category of evidence we had addressed: namely, testimony of Mercy medical staff who observed, treated, and diagnosed defendant with bipolar disorder after he was arrested for DUI.

¶ 12    Specifically, prior to trial, an assistant Public Defender initially communicated her expectation that an unnamed doctor and perhaps 10 witnesses (but no experts) would be called to testify in defendant's case. At a later pretrial hearing, however, a new attorney from the same office represented, without explanation, that Dr. Crescenzo would not be called to testify. Instead, defense counsel planned to introduce testimony from Dr. Michael Oliverio of the Kane County Diagnostic Center. Counsel explained that, because Dr. Oliverio had never evaluated, diagnosed, or consulted defendant, nor had he reviewed defendant's medical records, he would not be offering an opinion as to whether defendant actually suffered from bipolar disorder. Rather, Dr. Oliverio's testimony would concern bipolar disorder generally and its attendant symptoms. The court cautioned that, if defendant introduced Dr. Oliverio's testimony about bipolar disorder without

also providing evidence that defendant had, in fact, been diagnosed with bipolar disorder, the *jury* would improperly be forced to decide whether defendant *possessed* a mental illness, not just whether that illness, as opposed to alcohol, was responsible for impairment. Defense counsel explained that defendant would himself testify to having received a bipolar-disorder diagnosis, which would provide the necessary link between his behavior on March 31, 2013, and Dr. Oliverio's expert testimony about bipolar disorder. The court expressed skepticism, stating that it anticipated barring Dr. Oliverio's testimony, but that, in light of this court's earlier decision, it would remain open to considering further argument and, at the appropriate time, defense counsel could make an offer of proof. Although the court overruled the State's objection to defendant's anticipated testimony concerning his diagnosis, it expressed further concern that allowing Dr. Oliverio's testimony along with defendant's uncorroborated testimony, would improperly imply to the jury that an expert was "validating the existence of the mental health issue." The court explained that, before expert testimony about bipolar disorder would be admitted, defendant would need to present "medical confirmation" of his bipolar-disorder diagnosis to corroborate his testimony to that effect.

¶ 13    Despite these warnings, at trial, defense counsel offered no evidence to corroborate defendant's own testimony that he had received a bipolar-disorder diagnosis. Specifically, defendant testified that, when he was age 10 or 11, on account of outbursts that he was having at school, he was diagnosed by "Dr. Nadia" and "Dr. Randolph" of Rush-Copley hospital with attention deficit disorder, attention deficit hyperactivity disorder, and bipolar disorder. Defendant was prescribed medication, but stopped taking it around 2005, when he was 17 years old. He could not recall ever seeing another psychiatrist. Defendant denied drinking alcohol or using drugs the night of his arrest, but he agreed that the police recovered a bottle of cognac from his car and that

he was the car's sole occupant. Defendant testified that he had not slept in the three or four days preceding his arrest. No other evidence, documentary or otherwise, was admitted concerning defendant's alleged bipolar-disorder diagnosis.

¶ 14    In closing argument, the State argued to the jury that, although defendant said he had bipolar disorder, his actions on March 31, 2013, resulted from drinking and driving, not a mental health condition. Defense counsel disagreed and explained that defendant's red eyes, slurred speech, and poor driving were due to sleep deprivation caused by mental illness. In rebuttal, the State asserted that defendant's testimony about bipolar disorder "18 years prior" to the incident was simply an attempt to "use that as some kind of shield to explain away driving under the influence of alcohol," was "not believable," and that defendant knew to "make up stories about what had been happening" to try to explain it away.

¶ 15    During deliberations, the jury asked two questions: (1) whether testimony was considered evidence; and (2) the definition of reasonable doubt. In sum, the court responded that testimony was evidence and that it could not provide a definition of reasonable doubt. The jury returned a guilty verdict.

¶ 16    Defense counsel filed a posttrial motion arguing, in part, that the court erred in barring Dr. Oliverio's expert testimony about bipolar disorder, because Dr. Oliverio was prepared to testify as a teaching expert about bipolar disorder and common symptoms thereof, not to offer an opinion or diagnosis. The court denied the motion and sentenced defendant to 364 days in jail. Defendant timely appealed.

¶ 17                                II. ANALYSIS

¶ 18    On appeal, defendant argues that his trial counsel provided ineffective assistance where, at the retrial, he offered no evidence of defendant's bipolar diagnosis. Defendant asserts that, absent

his own uncorroborated testimony, counsel offered no support for his argument that his ability to operate his vehicle was impaired by mental illness, not alcohol. Defendant points out that this court remanded the case so that he could have the opportunity to present certain evidence in support of his defense, including testimony from Mercy hospital medical staff who observed, treated, and diagnosed him with bipolar disorder after his DUI arrest, but counsel, nevertheless, failed to introduce any of this evidence. He notes that counsel inexplicably abandoned an attempt to obtain evidence from medical staff or Dr. Crescenzo, the emergency room physician who, after consulting a psychiatrist, diagnosed him with bipolar disorder. He asserts that, if Dr. Crescenzo could not qualify as an expert witness on bipolar disorder, he could instead have testified as an occurrence witness who interacted with him and diagnosed him with bipolar disorder. Further, even if Dr. Crescenzo was, for some reason, unavailable, defendant argues that counsel should have at least obtained the medical records reflecting his bipolar diagnosis, either from his emergency room visit or from his treatment at Rush-Copley hospital, where he obtained his initial diagnosis. He continues that, once those records were obtained, an expert, such as Dr. Oliverio, could have reviewed the records to offer an opinion that defendant suffered from bipolar disorder at the relevant time, based on his medical records and evidence of his behavior on the date of his arrest. To properly advance his defense theory, defendant argues, counsel needed to offer evidence of a legitimate medical diagnosis, as well as evidence explaining how that diagnosis related to his behavior on the night of his arrest. Without the former, defendant was barred from presenting the latter and, he argues, his defense was "gutted." For the following reasons, we agree.

¶ 19    Where a defendant claims ineffective assistance of counsel, we apply the test in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Theis*, 2011 IL App (2d) 091080, ¶ 39. Under this two-prong test, the defendant must prove both that: (1) defense counsel's performance fell

below an objective standard of reasonableness (deficient-performance prong); and (2) due to defense counsel's deficient performance, the defendant suffered prejudice, such that the defendant was deprived of a fair trial, the result of which is unreliable (prejudice prong). *Strickland*, 466 U.S. at 687. In cases alleging ineffective assistance based upon a counsel's omission, *i.e.*, a failure to present evidence, the performance and prejudice prongs often overlap. See, *e.g.*, *People v. Jacobazzi*, 398 Ill. App. 3d 890, 916-17 (2009). Further, courts will more readily find incompetency when counsel has abdicated, as opposed to exercised, professional judgment. *Id.* at 916. Generally speaking, there is a strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance and that the challenged action or inaction was the product of sound trial strategy. *Strickland*, 466 U.S. at 689. Where, as here, the claim of ineffective assistance was not raised in the trial court, our review is *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 20    Addressing first the deficient-performance prong, we agree with defendant that trial counsel's failure to introduce any evidence, other than defendant's testimony, concerning his bipolar diagnosis was objectively unreasonable. We see no sound trial strategy in this omission. Indeed, this court had remanded the case for a new trial and to allow for the opportunity to introduce such evidence. We acknowledge that counsel planned to offer Dr. Oliveria's testimony. However, the trial court cautioned counsel before trial that his strategy to offer defendant's testimony about his diagnosis, with possibly *only* Dr. Oliverio's "educational" testimony, would not succeed. Despite this warning, nothing in the record shows counsel attempted to subpoena: the presence of Dr. Crescenzo, who diagnosed defendant with bipolar disorder after his DUI arrest; the presence of *any* Mercy hospital doctor, nurse, or other employee who observed defendant that night; the records from the Mercy hospital admission; or any records from Rush-Copley hospital,

where defendant testified he had received his initial diagnosis. We agree with defendant that evidence substantiating his bipolar-disorder diagnosis was crucial to his theory of defense.

¶ 21 We find instructive *People v. Popoca*, 245 Ill. App. 3d 948 (1993). In *Popoca*, the defendant was convicted of attempted murder. The defense had claimed that, due to his voluntary intoxication, the defendant lacked the specific intent to kill. Despite the fact that the defendant's intoxication was obviously critical to his defense, defense counsel did not present any expert testimony as to the defendant's intoxication or how it could have affected his ability to formulate an intent to kill, and the only evidence as to intoxication was from a laboratory technician who did not testify in terms readily understood by a jury. *Popoca*, 245 Ill. App. 3d at 954. The court determined that the trial court erred in denying defendant's postconviction, ineffective-assistance claim. *Id.* at 959. Here, defense counsel similarly failed to present evidence obviously critical to defendant's defense, *i.e.*, no evidence substantiating his bipolar disorder and how that disorder might cause impairment.

¶ 22 Of course, the failure to present evidence does not always reflect incompetence, as the evidence may be flawed or damaging to the defendant, such that competent counsel makes a strategic *choice* not to present it. See, *e.g.*, *People v. Perez*, 148 Ill. 2d 168, 186-87 (1992); see also *People v. Moore*, 208 Ill. App. 3d 515, 522-23(1990) (where the defendant was examined by a doctor, but trial counsel chose not to call him at trial, counsel may have been dissatisfied with the doctor's earlier testimony conceding that the defendant could have been malingering). Further, counsel's decision whether to present a particular witness is generally considered a strategic choice. See, *e.g.*, *People v. Hotwagner*, 2015 IL App (5th) 130525, ¶ 47. We also acknowledge that, where the record on appeal does not contain the evidence that defendant argues should have been introduced, ineffective-assistance claims may be better-suited for postconviction

proceedings. See, *e.g.*, *People v. Quinn*, 173 Ill. App. 3d 597, 606-07 (1988) (the court noted that counsel's failure to investigate a diminished-capacity defense would be more amenable to a post-conviction proceeding, where additional facts could be presented); see also *People v. Treadway*, 138 Ill. App. 3d 899, 903-04 (1985) (on direct appeal, where there was no external evidence was in the record showing what evidence could have been introduced, the defendant was not denied effective assistance of counsel for failure to investigate hypothetical and unnamed occurrence witnesses in support of an intoxication defense).

¶ 23    Here, in contrast to the aforementioned cases, the existence of the Mercy hospital records and what they might demonstrate is apparently not in dispute. In our prior decision, we noted defendant's arguments concerning their existence and the fact that the *State* had produced them, and we remanded for the opportunity for their introduction. See *Garcia*, 2017 IL App (2d) 141184-U, ¶¶ 4, 17. At both trials, that defendant may suffer from mental illness was apparently not in dispute, as at least two officers testified that they were familiar with defendant's mental instability, suggesting that medical documentation likely exists. Indeed, in its response brief on appeal, the State does not dispute that the Mercy hospital records exist or that Dr. Crescenzo diagnosed defendant with bipolar disorder after his arrest. As such, we are comfortable addressing defendant's claim, as his argument that counsel failed to obtain and present support for his defense more closely resembles a failure to investigate, as opposed to a reasoned, strategic decision. Where counsel's failure is the result of a lack of diligence in investigating the facts and law, rather than a strategy, counsel may be ineffective. *Perez*, 148 Ill. 2d at 186-87, 190-91 (noting that the failure to investigate a defendant's mental history may be grounds for an ineffective-assistance claim).

¶ 24    The State argues that counsel's strategy was sound and reasonable. It notes that the offer of proof prepared after the first trial stated that Dr. Crescenzo would testify, in part, that, after

defendant was admitted, and "based on the information provided to him by other members of the hospital staff[,] he concurred with the determination that the defendant suffers from bipolar disorder and signed off on the defendant's diagnosis and treatment plan." Thus, the State argues, because Dr. Crescenzo, an emergency room physician, could not qualify as an expert on bipolar disorder and his diagnosis was rendered only after consulting with a psychiatrist and others, Dr. Crescenzo's testimony would have been of questionable value, and it was therefore sound strategy for counsel not to call him.

¶ 25 We disagree. Many of the State's arguments might implicate the strength of the alleged evidence, but it would be for the jury to determine the weight to give it. Indeed, the State makes much of the fact that Dr. Crescenzo made a diagnosis based on information provided to him, after having collected and discussed medical information about defendant from physician's assistants, nurses, and a psychiatrist, such that he purportedly did not make any of his own findings or conclusions as to defendant's mental state. Yet, it fails to recognize that the offer of proof also noted that Dr. Crescenzo *concurred* with others concerning defendant's presentation and diagnosis, which reflects a personal assessment, and, ultimately, as the treating physician, he provided defendant's diagnosis. As defendant points out, whether an expert or not, Dr. Crescenzo was at a *minimum* an occurrence witness who could have testified to his own observations, process, and rationale for the diagnosis he made. Indeed, the State concedes that, "[a]s a treating physician, Dr. Crescenzo would testify to opinions that he formed based on observations he made while attending to defendant in the emergency room." See *People v. Cortez*, 361 Ill. App. 3d 456, 465-55 (2005). Moreover, even if Dr. Crescenzo was personally unavailable, we see no reasonable strategy for failing to present *any* witness who could lay a foundation for defendant's hospital records from that evening or for the records themselves not to be produced or provided to Dr.

Oliverio for his assessment. The State does not offer much in response to this failure, other than asserting that, although a doctor can provide an expert opinion based on reports or medical tests performed by others, counsel may make a strategic choice not to present such testimony. That may be true, but the strategy may not be sound. In sum, counsel's failure here is not simply about Dr. Crescenzo. The strategy at issue, if any, is counsel's failure to offer *any* evidence establishing a nexus between defendant's behavior before, during, and after his DUI arrest, and his alleged bipolar diagnosis. Although there might have been potential shortcomings or flaws in individual pieces of evidence, we agree with defendant that it was objectively unreasonable for counsel to leave defendant's theory virtually unsupported.

¶ 26    As to the prejudice prong, defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. at 694. Here, our conclusion that defendant suffered prejudice somewhat overlaps with our analysis concerning the deficient-performance prong. Again, evidence substantiating defendant's diagnosis was crucial to his defense. We note that, in *Popoca*, the court agreed with the defendant that the evidence that trial counsel failed to present would have *substantially improved* the defendant's claim. *Popoca*, 245 Ill. App. 3d at 957. Here, not only would documentation of defendant's diagnosis have substantially improved his claim that any impairment was due to mental instability, not alcohol consumption, without it, and because of additional evidence that *was* admitted, defendant was arguably in a *worse* position at his retrial than at his initial trial. We remanded this case to allow defendant the *opportunity* to introduce evidence supporting his defense, including the three categories of evidence that he had specified on appeal (Sheldon's testimony, video from the station, and evidence from the hospital), yet

counsel failed to introduce evidence in the most important of those three categories. Indeed, as defendant notes, while the jury heard Sheldon's testimony and viewed the full video of defendant's behavior at the police station, it was provided no *evidence* suggesting an *alternative* explanation for that conduct, besides alcohol consumption. Counsel's strategy to introduce evidence showing defendant acting extremely agitated and bizarrely, but not *also* introducing medical evidence concerning defendant's bipolar diagnosis, was undoubtedly damaging to defendant and likely ensured his conviction. Without evidence that defendant had, in fact, received a bipolar diagnosis, coupled with explanatory evidence that defendant's conduct and appearance on the night of his arrest would be consistent with a person experiencing a bipolar episode, the jury had no evidence before it, other than testimony from police officers concerning possible alcohol consumption, to explain *what* and *why* defendant behaved that way.

¶ 27 The State argues that there was no prejudice, "given the quantum of evidence presented" against defendant. To the contrary, we emphasize that there were no Breathalyzer, blood, or field-sobriety tests here, and, although a bottle of cognac was found in his car, it was either not recovered or not presented at trial, and defendant testified that he was not drinking. Thus, the jury viewed the full video of defendant's behavior and then it was left to weigh defendant's uncorroborated and, essentially, self-serving testimony of his diagnosis against the police officers' collective opinions that defendant was intoxicated. In our view, while the lack of evidence at defendant's first trial prevented him from offering a defense, the evidence that counsel failed to offer at his retrial, particularly in light of the evidence he did present, gutted that defense and likely *contributed* to his conviction. We again reverse defendant's conviction and remand for a new trial.

¶ 28                                III. CONCLUSION

¶ 29    For the reasons stated, the judgment of the circuit court of Kane County is reversed and the

cause is remanded.

¶ 30    Reversed and remanded.