THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOEL BUIE, Defendant-Appellant.

First District (4th Division)   No. 1—88—2166

Opinion filed November 5, 1992.—Rehearing denied January 14, 1993.

Randolph N. Stone, Public Defender, of Chicago (Julie M. Campbell, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

Following a jury trial, the defendant was found guilty of murder and armed robbery and sentenced to natural life imprisonment for murder, and a 30-year concurrent sentence for armed robbery. On appeal, the defendant contends: (1) that his fourth amendment rights were violated when he was detained without probable cause and his confession should have been suppressed; (2) that his fifth amendment rights were violated because his confession was not voluntary; (3) the hair analyst expert made an improper scientific conclusion; (4) the hair expert's findings were based on incorrect data; (5) that he was denied due process and the right to a fair trial when the expert's report which was tendered to the defense before trial differed from the expert's trial testimony; (6) that the trial court erred in denying the defendant's motion for a directed verdict on the armed robbery count when the evidence failed to show that the force involved in the murder was related to the taking of property or money; (7) that his constitutional confrontation rights were denied when the State introduced inadmissible hearsay testimony and relied on that testimony during closing argument; (8) that the State failed to prove his guilt beyond a reasonable doubt; (9) that the trial court committed reversible error when it refused his challenge for cause to excuse a juror; (10) that the trial court abused its discretion when it found that the offense was accompanied by brutal and heinous behavior; and (11) that he was sentenced under a statute which violated his due process and equal protection rights.

We summarize the evidence from the record.

I.

PRETRIAL HEARING ON THE DEFENDANT'S MOTION TO QUASH ARREST
AND SUPPRESS STATEMENTS

Detectives McGuire and Tansey were assigned to the victim's murder investigation on August 17, 1986. They went to the victim's

home, where they found no signs of a forced entry. When they were inside the house, they found that the burglar alarm system had been ripped from the wall and had a blood smear on it. While proceeding down to the basement, they observed a long scratch mark along the right side of the wall along the stairs. At the bottom of the stairs, they found a metal ceiling hook. They found the victim in the basement lying facedown, her hands bound behind her with a nylon, and her mouth gagged with a nylon. She appeared to have died from a blunt head trauma. To the victim's right was a toolbox and tools were strewn across the floor. The detectives proceeded to the second floor of the house, where they found the master bedroom ransacked.

Later that day while canvassing the area, the detectives spoke with the defendant, who resided two houses west of where the victim lived. The defendant told them that he saw the victim on August 15 at about 4 p.m. She had asked the defendant if he could fix a ceiling hook in her living room. The defendant told her to get the materials and then he would fix it.

The detectives also spoke to two of the victim's co-workers. They told the detectives that the victim was scheduled to work on August 16 and 17. When she did not report to work, they went to her home, but no one answered the door. One of the victim's co-workers also decided to go over to the defendant's home to inquire about the victim. The defendant told her that he had fixed a ceiling hook in the victim's living room on August 15. The co-worker also told the detectives that the defendant was vague and slow when speaking with her.

McGuire stated that he determined from his investigation that the defendant was the last person to see the victim alive. On August 18, Detectives Popovits and Robertson were assigned to investigate the victim's murder and learned all of the aforementioned information from the previously assigned detectives.

On August 19 at 6 a.m., Popovits and Robertson went to the defendant's home and identified themselves to the defendant as officers who were investigating the victim's homicide. They requested that the defendant come to headquarters to be interviewed. They waited outside while the defendant retrieved his coat and the defendant rode in the back seat of their squad car. Both detectives testified that the defendant was not handcuffed at this time. After arriving at Area One headquarters, the defendant was seated in an interview room and was given his *Miranda* rights. The defendant told Popovits that the last time he had seen the victim was on August 15 at 4 o'clock when she asked him to hang a ceiling hook for her. The defendant went into her home, looked at the job, and told her that he

would do the job the next day after she purchased the materials. The defendant consented to take a polygraph test. When the defendant was told that the test could not be scheduled until 9 a.m. that morning, the defendant said he wanted to help the police in any way he could. At 8:30 a.m., the defendant was given a polygraph examination and signed a statement that he was voluntarily submitting to that examination. After the results were analyzed, it was determined that the defendant failed the polygraph as to his participation in and knowledge of the victim's murder.

The defendant agreed to be fingerprinted and to submit hair samples. In the interim, the detectives interviewed the defendant's alibi witness, his girl friend, Adlena Bright. She told one officer that on the afternoon of August 15, she had smoked reefer with the defendant. She later told another detective that in the early morning and afternoon of August 15, she and the defendant ingested cocaine and reefer. The defendant's account of the events of August 15 differed from Bright's account. When confronted with the disparity, the defendant added that he had purchased and ingested cocaine several times on August 15. Later Bright told detectives that the defendant had tried to pawn a gold necklace to purchase cocaine.

On August 19, the defendant spoke with Detective Robertson and confessed to the victim's murder. The defendant told Robertson that he wanted to relieve himself of the burden of what he had done. On August 20, the defendant agreed to give a court-reported statement in which he again confessed to the victim's murder. The defendant also requested to direct the detectives to the location of his bloody clothes and items which he took from the victim's home. The defendant accompanied the detectives to several locations but nothing was recovered.

The defendant testified that the detectives initially told him that he had to go to the police station for questioning. He stated that he wanted to make a phone call but the detectives would not allow it. He was handcuffed and brought to the station. At the station, he was not allowed to make a phone call. He stated that he was never read his *Miranda* rights. When he was asked to take a polygraph test, the defendant wanted to go home first, but the detectives would not allow him to do so. The defendant further testified that the polygraph examiner slapped him and hit him in the chest with a closed hand. Another officer pushed him against the wall. When he was brought back to the interview room, he was handcuffed to the wall. The defendant stated that he was not given any food and was not allowed to make a phone call. Detective Robertson told the defendant that he was mak-

ing him "look like an ass" in front of his boss and then "beat the shit" out of him. Robertson made the defendant get on his knees while he was still handcuffed to a ring on the wall and hit him in the stomach. Robertson pushed him onto the floor and was punching him with a closed fist and kicking him. Robertson told the defendant that he could "blow [his] fucking brains out and dump [him] somewhere around Indiana." At that time, the defendant told Robertson that he would say anything he wanted him to say. Robertson told the defendant what to say in his confession to the victim's murder. Robertson called Detective Thompson into the interview room and the defendant confessed to the murder. The defendant resisted giving a court-reported statement to the assistant State's Attorney, but he was forced to cooperate.

It was stipulated that if Detective McGuire were called to the stand, he would testify that during his investigation on August 17, he spoke with Rosalie Pierce, who stated that she spoke with the victim on August 15 between 7 and 7:30 p.m. while the victim was working on her lawn.

It was further stipulated that the paramedic who examined the defendant at Cook County jail would testify that he conducted a physical examination of the defendant on August 21. The defendant told him that he was in good health. He had no bruises, cuts, swelling, or soreness on his body.

We first address the defendant's contention that the trial court erred by denying his pretrial motion to quash arrest and suppress his confession. The defendant claims that he was detained without probable cause in violation of his fourth amendment rights and his confession should have been suppressed as a result of that unlawful seizure. The defendant argues that he was at the police station involuntarily and the police did not have probable cause to arrest him. The defendant points to the fact that he had five interviews during his 24-hour stay at the police station and at one point was handcuffed to the wall. He wanted to go home before his polygraph, but was not allowed to do so.

In determining whether an individual was under arrest, a trier of fact must determine whether a reasonable person in the same circumstances, innocent of any crime, would have concluded that he was not free to leave. (*People v. Brown* (1990), 136 Ill. 2d 116, 554 N.E.2d 216.) The test is objective and it is irrelevant whether the defendant believed he was under arrest or whether the police intended to detain the defendant against his will, unless that intent was conveyed to the defendant. (*People v. Bury* (1990), 199 Ill. App. 3d 207, 556 N.E.2d

899.) A reviewing court will not reverse the trial court's finding on a motion to quash arrest unless that finding was manifestly erroneous. *People v. Booker* (1991), 209 Ill. App. 3d 384, 568 N.E.2d 211.

■ The trial court found that the defendant cooperated fully with the investigation and would have gone voluntarily to the police station if probable cause did not exist. We do not believe the trial court's finding was manifestly erroneous. As we have discussed earlier in this opinion, the pretrial testimony demonstrates that Detectives Robertson and Popovits arrived at the defendant's home on August 19 and asked the defendant to assist them in their investigation of the victim's murder. The defendant voluntarily agreed to go to with them to the police station. The detectives testified that the defendant was not handcuffed at that time. While the defendant's version of what took place differed significantly from the testimony of the detectives, it is the function of the trial court to determine the credibility of the testifying witnesses and to resolve any conflict in their testimony. *People v. Redd* (1990), 135 Ill. 2d 252, 533 N.E.2d 316.

Moreover, we agree with the trial court's finding that there was probable cause to arrest the defendant on August 19. Probable cause exists when the police possess enough evidence to lead a reasonable man to believe that a crime has been committed, and that the defendant committed it. (*People v. Neal* (1985), 111 Ill. 2d 180, 489 N.E.2d 845.) The totality of the circumstances known to the police officers must be considered. (*People v. Montgomery* (1986), 112 Ill. 2d 517, 494 N.E.2d 475.) A reviewing court must not disturb the trial court's findings on probable cause unless they are manifestly erroneous. *People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766.

Applying these principles, we conclude that the police had sufficient information to arrest the defendant. At the time the officers went to the defendant's home, they knew he was one of the last people, if not the last person, to see the victim alive. The defendant had previously told the officers that the victim had asked him to fix a ceiling hook in her home on the day she was murdered and he agreed to do it once she purchased materials. The defendant had told the victim's co-worker that he had already hung the ceiling hook in the victim's home. The officers found a long scratch mark on the wall leading to the basement of the victim's home and a metal ceiling hook at the bottom of the stairs. There was no sign of forced entry into the victim's home. Based upon these facts, known to the police at the time they picked up the defendant, probable cause existed to believe the crime was committed and that the defendant committed the

crime. Therefore, the trial court properly denied the defendant's motion to quash arrest and suppress his confession.

The defendant further alleges that even if he was lawfully detained, his confession should have been suppressed because it was not voluntarily given.

A confession is voluntarily given if, after considering all of the circumstances in the record, it can be said that it was made freely and without compulsion. (*People v. Hunley* (1989), 189 Ill. App. 3d 24, 545 N.E.2d 188.) A trial court's finding that a defendant's confession is voluntary will not be overturned on review absent a showing that it is against the manifest weight of the evidence. *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984.

██ After reviewing the circumstances surrounding the defendant's confession, we find the court's determination of voluntariness was not against the manifest weight of the evidence. There was evidence that *Miranda* warnings were given before the defendant's confession to Robertson and the assistant State's Attorney. There was evidence that the various interview sessions were relatively brief, sufficiently separated in time from each other, and did not involve any threats or coercion. There was evidence that the defendant was fed before giving his statement. Moreover, the defendant's confession included his assertion that he had not been mistreated during his time at the police station.

The defendant argues that he was threatened and beaten by police officers. Testimonial conflicts must be resolved by the trier of fact based upon the credibility of the witnesses. (*People v. Matthews* (1990), 205 Ill. App. 3d 371, 562 N.E.2d 1113.) The trial judge heard the testimonies of Thompson and Robertson, who asserted that the defendant was never threatened or beaten. Additionally, the judge heard the testimony of the assistant State's Attorney who interviewed the defendant before he gave his court-reported statement. The attorney testified that the defendant's appearance was normal, he did not appear to have any injuries, and he was not threatened in any way. The stipulated testimony of the paramedic who examined the defendant upon his jail admission stated that the defendant's physical examination revealed no bruises, cuts, swelling, or soreness. The defendant told him that he was in good health and had no physical complaints. We do not believe the trial judge's finding that there was no physical or psychological coercion upon the defendant by the officers is against the manifest weight of the evidence.

The defendant also argues that his statements were involuntary because he was 24 years old and lived in the United States for only

seven years. The defendant lived in Israel for 13 years and Liberia for 7 years. It is evident from the record that the defendant understood and spoke English. There is no evidence that the defendant's age or inability to understand English was used to compel his confession.

Accordingly, we cannot say that the determination of the voluntariness of the defendant's confession is against the manifest weight of the evidence.

## II.

### TRIAL

At trial, the testimony of the detectives involved in the investigation and the victim's co-workers was essentially the same as that previously summarized from the pretrial hearing. Additionally, the medical examiner who performed the autopsy on the victim testified to numerous injuries which were found on the victim's face and neck. The victim's skull showed extensive skull fractures on the base of her head, brain, and skull. The victim died as a result of severe cranial cerebral injuries caused by blunt trauma.

The victim's husband testified that he was out of town on August 15. He telephoned his wife on August 16 in the afternoon, but there was no answer. He learned that his wife was dead while at a relative's house in Tennessee. He testified that his wife always wore her wedding band, a pear-shaped cocktail ring, and a gold chain with her initial "B" on it. When he returned home, he observed that two pocket watches, cuff links, a ring, a camera and $100 in cash were missing. He also noticed that his hammer was missing from his toolbox. He observed that the burglar alarm was torn from the wall and he discovered a deep scratch in the wall along the stairs leading to the basement.

Maria Pulling, an expert in hair and fiber analysis, testified that she analyzed hair samples from the defendant's girl friend, the defendant, and the victim. Pulling stated that she analyzed hair on the victim's clothing and hair found among broken glass from her home. Pulling identified certain hairs to be consistent with the defendant's known hair sample. Pulling opined that "[w]ithin a reasonable degree of scientific certainty," the hair originated from the defendant. Pulling also stated that all other persons could not be excluded but that she "would be hard pressed to find another individual within this region that exhibits those characteristics point for point."

Detective Thompson testified that the defendant confessed the details of the victim's murder to him. The defendant had a conversation

with the victim about fixing a ceiling hook in her home. He knew the victim's husband was out of town. He went over to her home on August 15. The victim went into the basement and got a hammer and a nail and brought it upstairs. The defendant asked her where the hook was. The victim told him that the hook was in the basement but that she could not reach it. The defendant went down to the basement with her and took the hook from a ceiling beam in the basement. They walked up the stairs with the defendant in front. When he reached the top of the stairs, he turned around and pushed her down the basement stairs to the floor. The victim was somewhat dazed and was reaching for a glass bottle. The defendant grabbed the bottle and hit the victim in the head with it until the bottle broke. He reached into his pants top where he had put the hammer and beat her in the head with it. He put the hammer and the bottle into a bag, went upstairs into the kitchen, and washed his hands at the kitchen sink. The defendant then went upstairs and ransacked the bedroom by throwing things from drawers onto the bed and floor to make it look like a robbery. The defendant also took a camera, a watch, some jewelry, and some money from the dresser. He went back downstairs and tied the victim's hands with some nylons and also tied the victim's mouth. The defendant took the victim's necklace and ring. He went back upstairs and tore out the alarm system and turned on the gas stove to melt away his fingerprints. He took money from a purse in the kitchen and left through the back door.

The defendant further told Thompson that he went home, cleaned up, changed, bought some cocaine, went to his girl friend's house and they ingested some cocaine. He went back to his brother's house, bought more cocaine, and ingested more cocaine.

After the defendant confessed to killing the victim, Detectives Tansey and Robertson returned to the victim's home and found the hole in the ceiling beam where the ceiling hook had been removed which the defendant had described to them.

An expert in forensic microscopy testified for the defense. The expert did not examine the hairs in the instant case, but opined that, based on his experience, hair analysis could exclude an individual as a suspect but could not "conclusively include" or identify an individual.

A former co-worker of the defendant testified that she loaned the defendant $100 on August 13 and that it was not unusual for the defendant to borrow money from her.

The defendant's testimony was essentially the same as his pretrial testimony. The defendant added that he was unable to write English

at the time of the murder and that Hebrew is his best speaking language. He was attending a junior college to obtain a GED.

The defendant denied harming the victim in any way. He stated that he purchased cocaine the night the victim was murdered and used the money that he borrowed from his co-worker. The defendant stated that he offered to sell a gold chain to obtain more cocaine, but the chain belonged to his uncle and did not have an initial on it. The defendant admitted that he did not complain about the police brutality at the time he had his jail physical.

The State's rebuttal witnesses, the paramedic who performed the defendant's physical and the court reporter who transcribed the defendant's statement, testified that there were no signs of physical injury to the defendant when they interacted with him.

The defendant contends that several trial errors warrant reversal of his conviction. First, the defendant argues that the State's hair expert made an improper conclusion when she testified that "to a reasonable degree of scientific certainty," hairs recovered from the victim's clothing and glass collected from her home belonged to the defendant. In support of his allegation, the defendant relies on *People v. Linscott* (1987), 159 Ill. App. 3d 71, 511 N.E.2d 1303. In *Linscott*, the court reversed the defendant's murder conviction because the prosecutor's closing argument deprived the defendant of a fair trial.

The defendant's reliance on *Linscott* is misplaced. Both the defendant and the State ignore our supreme court's decision in *People v. Linscott* (1991), 142 Ill. 2d 22, 566 N.E.2d 1355, in which the court vacated the judgment of the appellate court. At trial, the prosecutor had argued that the defendant's pubic hairs and the pubic hairs combed from the victim "matched" and "were identical." The appellate court stated that this distorted the expert's testimony, which was that the defendant's hair samples were "consistent" with the victim's hair. The expert did not testify that the hairs matched. In reversing the defendant's conviction, the appellate court noted that there was very little other evidence linking the defendant to the crime.

The supreme court disagreed with the appellate court's assessment of the prosecutorial error and held that the prosecutor's "match" comments were improper, but were not so egregious as to deny the defendant a fair trial. (*Linscott*, 142 Ill. 2d at 35, 566 N.E.2d at 1361.) The court stated that the jury, having heard the expert's testimony, was free to reject the prosecutor's analogy.

■ In light of the supreme court's holding, the defendant's argument must fail. In the instant case, the hair expert stated that "[w]ithin a reasonable degree of scientific certainty, I would have to

say that the hair originated from Joel Buie." The expert further testified that she could not exclude all other persons in the world, other than the defendant, as being a possible source for the hair fragments. In closing argument in the instant case, the prosecutor also pointed out that the expert said that "she could not exclude every other person in the world as a source for that hair."

Unlike *Linscott*, the prosecutor in the instant case did not misrepresent the expert's testimony. Also, unlike *Linscott*, there is other evidence in this case linking the defendant to the crime, in particular, his detailed confession.

We further believe that the State's expert appropriately rendered her opinion based upon her experience and qualifications. When a subject matter is complicated and outside the scope of knowledge and understanding of the ordinary lay person, a witness who has expert knowledge on that subject is allowed to voice an opinion on it to aid the trier of fact in understanding the matter and in resolving the factual questions. (*Hernandez v. Power Construction Co.* (1978), 73 Ill. 2d 90, 382 N.E.2d 1201.) In her testimony, the expert detailed the process by which hair samples are analyzed and compared with each other. She also stated that the defendant's hair samples were identical in all of the characteristics that she listed in her notes to describe the hair found on the victim's clothing. Thus, she had sufficient basis to state that "[w]ithin a reasonable degree of scientific certainty," the unknown hair originated from the defendant.

The defendant also argues that the hair samples were not collected properly, nor analyzed properly. The defendant cites no legal authority in his argument. Moreover, the defendant waived this issue by failing to object at trial. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

The defendant next contends that he was denied his right to a fair trial because his motion for a mistrial for a discovery violation was denied. Specifically, the defendant alleges that the State's hair expert reports were made in December 1986 and in February 1988. The expert's reports were not tendered to the defendant until February 18, 1988, three weeks before her testimony at trial. The judge was willing to allow the defendant additional time to perform any further testing of the hair samples. In the report, the expert concluded that the hair "could have come from the defendant." Yet, her trial testimony stated that "[w]ithin a reasonable degree of scientific certainty," the hair came from the defendant. The defendant now argues that this resulted in surprise and prejudice and deprived him of due process and a fair trial.

Supreme Court Rule 412 provides that the State is required to disclose the reports and statements of experts made in connection with the case and the results of any scientific tests that were performed. (107 Ill. 2d R. 412(a)(iv).) The State did disclose the reports and statements of its expert and thus complied with the discovery rule. The defendant is essentially objecting to the State's timing and the disparity between the report's content and the expert's trial testimony.

■ We find the defendant's argument to be without merit. As far as the timing, the defendant had ample opportunity to question the State's expert and obtain his own expert. As for the inconsistency in the expert's report and testimony, we find the distinction in the two statements to be insufficient to have prejudiced the defendant. The defendant was allowed to cross-examine the expert, and did, indeed, use the inconsistency for purposes of impeachment. The defendant also presented his own expert who testified that hair analysis could be used to exclude individuals, but not to include them. Thus, for all of the aforementioned reasons, we do not believe that the judge erred in denying the defendant's motion for a mistrial for a discovery violation.

The defendant further contends that his case should be remanded for resentencing because his armed robbery conviction cannot stand. The defendant argues that an armed robbery charge requires that property be taken from a person by force, and that force must precede or be contemporaneous with the taking. In the instant case, the defendant claims, none of the property was recovered. The defendant's statement was the only evidence linking him to the armed robbery. In that statement, the defendant said that he took the property simply to make the murder scene look like a robbery. Therefore, the defendant concludes the force was not used to take the property and the armed robbery conviction cannot stand.

■ In *People v. Williams* (1987), 118 Ill. 2d 407, 515 N.E.2d 1230, the defendant raped the victim and was later found in possession of the victim's gold chain necklace. The defendant was convicted of both rape and armed robbery. In affirming the armed robbery conviction, the supreme court noted that the offenses were "essentially a single series of continuous acts committed by the defendant." (118 Ill. 2d at 416, 515 N.E.2d at 1234.) The court further stated:

"Whether the defendant took the necklace from the victim's person or whether he picked it up off the floor after committing the assault, we believe that in this case there was the necessary concurrence between the defendant's use or threat of

force and his taking of the necklace to give rise to the offense of armed robbery under the statute." (*Williams*, 118 Ill. 2d at 416, 515 N.E.2d at 1234-35.)

In the instant case, we believe that the taking of the victim's ring, necklace, and other possessions from the home was essentially a single series of continuous acts committed by the defendant. A jury could have found, beyond a reasonable doubt, from the evidence presented at trial that the defendant took the victim's property by the use of force. While the defendant's confession stated that he ransacked the bedroom to make it appear as a robbery had taken place, he also stated that he took the victim's necklace and ring off of her dead body. There was ample evidence of the defendant's cocaine use before and after the victim's murder. His girl friend told the officers that he used a gold necklace to purchase cocaine. The defendant also testified that he offered to sell a gold chain for cocaine, but stated that the chain belonged to his uncle.

We, therefore, believe that there was the necessary concurrence between the defendant's use of force and the taking of the victim's jewelry and property to give rise to the offense of armed robbery.

The defendant further contends that the admission of certain hearsay statements into evidence violated his sixth amendment right to confront the witness against him. Specifically, the defendant objects to Detective O'Leary's statement that the defendant's girl friend told him that she and the defendant were doing some narcotics and that the defendant had left the apartment for awhile. Secondly, the defendant points to Detective Robertson's statement that the defendant's girl friend told him that she and the defendant were using cocaine and that the defendant purchased cocaine by pawning a gold necklace. The defendant argues that both of these statements were offered for their truth, and since the defendant's girl friend did not testify at trial, she was not available to cross-examine.

We believe the defendant's contention is without merit. With regards to the first statement, the defendant's objection was a general objection as the defendant did not state "hearsay" as the specific ground. A general objection raises only the question of relevance. (*Johnson v. Bennett* (1946), 395 Ill. 389, 69 N.E.2d 899.) We believe that O'Leary's statement was relevant to explaining the course of the police investigation. Since the statement was inconsistent with what the defendant had previously told the officers, the statement illustrated how they became suspicious that the defendant murdered the victim. The statement was also used to rebut the defendant's testimony that his confession was coerced. It was further used for the

purpose of explaining what led to the defendant's confession because he was confronted with the inconsistency between his statements to the officers and his girl friend's statements prior to confessing to the murder.

The second statement was objected to on the ground of hearsay. It is well established that an out-of-court statement not offered for the truth of the matter asserted is not hearsay. (*People v. Loggins* (1985), 134 Ill. App. 3d 684, 480 N.E.2d 1293.) Officer Robertson's statement was not offered for the purpose of establishing that the defendant purchased cocaine by pawning a gold necklace, but rather for the purpose of establishing the inconsistencies between the defendant's statements to the police and his girl friend's statements. Robertson's statement was properly admitted as it was relevant to all of the issues we have already discussed with regards to O'Leary's statement.

■ The defendant also alleges that the State improperly relied on the alleged hearsay statements during closing argument. Since the prosecutor was summarizing the properly admitted evidence, there was no error.

The defendant next asserts that he was not proved guilty beyond a reasonable doubt of the victim's murder and armed robbery. In evaluating the sufficiency of proof upon review, this court must assess whether the evidence, when viewed in the light most favorable to the State, allows any rational trier of fact to find the elements of the offense beyond a reasonable doubt. *People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781.

■ We find ample evidence in the record to allow a rational trier of fact to have convicted the defendant of murder and armed robbery, beyond a reasonable doubt. The defendant's confession detailed the course of events which took place in the victim's home and resulted in her murder. Further, while it is apparent that the jury did not believe that his statement was coerced, the defendant's confession contained details that even the police did not know until after the confession. Specifically, the defendant told the officer that he removed the ceiling hook from the ceiling in the basement. A picture of the hole in the ceiling beam in the basement where the defendant removed the hook was taken after his confession and was admitted into evidence. The jury heard testimony that in spite of the defendant's allegations that he was kicked and beaten by the police in order for them to obtain a conviction, there were no bruises, scratches, or any other physical evidence to support his statements. By his own admission, the defendant

was in the victim's home on the day she was murdered. The defendant further testified at trial that he purchased cocaine and traded a gold chain for the cocaine because he was short of funds. The jury heard testimony that hairs found on the victim's clothing and among the broken glass in the basement were consistent with the defendant's hair.

After considering all of the evidence, we conclude that the State's evidence left no reasonable doubt of the defendant's guilt.

The defendant next argues that the trial court committed reversible error when, during *voir dire*, it refused the defense challenge for cause to excuse one of the jurors. The purpose of *voir dire* is to screen for and eliminate prospective jurors who are unable or unwilling to be impartial. (*People v. Washington* (1982), 104 Ill. App. 3d 386, 432 N.E.2d 1020.) A person is not competent to sit as a juror if his state of mind is such that with him as a member of the jury, a party will not receive a fair and impartial trial. (*People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705.) The determination of whether a prospective juror is impartial is within the sound discretion of the trial court and will not be reversed unless the trial judge's determination is against the manifest weight of the evidence. *People v. Johnson* (1991), 215 Ill. App. 3d 713, 575 N.E.2d 1247.

The defendant argues that the juror at issue stated during *voir dire* that she was a good friend of a Chicago police officer. When asked by the court whether she could honor her oath as a juror and base her verdict solely on the sworn testimony of the witnesses, the juror responded that "It would be difficult not to hear his opinion which I have heard for over eight or ten years. I could probably try." However, the court further questioned the juror in an effort to expose any potential impartiality. The juror stated that she would make every effort to put aside the conversations she had had with her police officer friend and repeatedly affirmed her ability to honor her oath as a juror. The juror agreed that she would base her decision solely on the testimony of the witnesses, that she would follow the law as the judge instructed it, and that she would assess the credibility of the witnesses. We believe the *voir dire* was extensive enough to eliminate the possibility of the juror's potential bias.

We believe that the trial judge's determination with respect to the challenge against this juror was not against the manifest weight of the evidence.

The defendant next objects to the trial court's finding that the offense was accompanied by brutal and heinous behavior indicative of wanton cruelty. The defendant states that he had no criminal history,

there was no evidence of premeditation, and he did not "behave surly when sentenced." Therefore, the defendant concludes that his behavior was not brutal and heinous and he should not have been sentenced to natural life imprisonment.

Conduct is "heinous" if it is hatefully or shockingly evil, grossly bad, enormously and flagrantly criminal. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.) "Brutal" includes conduct which is grossly ruthless, devoid of mercy or compassion, or cruel and cold-blooded. *People v. La Pointe*, 88 Ill. 2d at 501, 431 N.E.2d at 353.

■■■ We believe the trial court properly sentenced the defendant to natural life imprisonment as his conduct was brutal and heinous. The defendant beat the victim's head with a glass bottle and a hammer until she died from the trauma. He then gagged her and tied her hands behind her back with nylons and left her on the floor of her basement. The photographs graphically illustrate the severity of the beating.

Regarding the defendant's lack of criminal history, the defendant in another section of his brief has conceded that the defendant had previously been arrested on a battery charge. His lack of premeditation and conduct at the sentencing hearing cannot be said to mitigate the cruel, cold-blooded, and flagrantly criminal acts of the defendant.

Finally, the defendant contends that he was sentenced under a statute which violates his equal protection and due process rights because the statute permits two different penalties for first degree murder. Specifically, the defendant was sentenced under section 5—8—1(a) of the Uniform Code of Corrections, which provides for a term of natural life imprisonment if the murder was accompanied by brutal and heinous behavior. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1).) The defendant notes that pursuant to section 5—8—2(a)(1), a court may sentence a defendant to an extended term of imprisonment if the murder was accompanied by brutal and heinous behavior. Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a)(1).

The Code mandates that a circuit court weigh aggravating and mitigating factors before imposing a sentence and it is the presence of the statutory factors which determine the nature of the sentence imposed on a defendant found guilty of brutal and heinous behavior. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.) The court in *La Pointe* held that because the circuit court does not have unbridled discretion in sentencing a defendant to natural life imprisonment or an extended term, the defendant's attack on the constitutionality of the first degree murder statute could not succeed. See also *People*

*v. Cartalino* (1982), 111 Ill. App. 3d 578, 444 N.E.2d 662; *People v. Abernathy* (1989), 189 Ill. App. 3d 292, 545 N.E.2d 201.

■ We agree that the factors in mitigation and aggravation provide the necessary guidance for the trial court to decide whether a particular defendant be sentenced to life imprisonment or an extended term.

For all of the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

JOHNSON and McMORROW, JJ., concur.