THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL WILLIAMS, Defendant-Appellant.

First District (1st Division)    No. 1—92—0358

Opinion filed March 20, 1995.—Rehearing denied June 20, 1995.

WOLFSON, J., dissenting.

Michael J. Pelletier and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendant Michael Williams was found guilty of murder and sentenced to 80 years' imprisonment. In *People v. Williams* (1989), 192 Ill. App. 3d 304, 548 N.E.2d 738 (*Williams I*), this court reversed and remanded for a new trial, holding that defendant had been denied effective assistance of counsel. Following retrial before a jury, defendant was again found guilty of murdering Karen Easton and sentenced to 80 years' imprisonment. Defendant again appeals his conviction and sentence.

For the purpose of brevity, this court could adopt the recitation of facts set forth in *Williams I*. Although much of the testimony at defendant's first trial was stipulated to and not challenged by counsel, and while witnesses testified in this trial that did not testify previously, the facts elicited in the jury trial are sufficiently similar to those presented in the prior bench trial. (See, *e.g., People v. Stack* (1993), 244 Ill. App. 3d 166, 613 N.E.2d 1175 (adopting facts of prior trial).) Moreover, this appeal challenges rulings made before trial and during sentencing, not rulings made during the retrial. Thus, the evidence elicited at retrial and differences in evidence between the two trials will be only briefly summarized below.

The record on appeal indicates that the mandate of this court was filed with the circuit court on February 26, 1990. Defendant was first brought before Judge Bailey, who had presided at defendant's previous trial, on March 22, 1990. The case was continued to April 6, 1990. The record indicates that the case was again continued on five separate dates, during which time the public defender sought private counsel to represent defendant. On May 18, 1990, private counsel filed an appearance to represent defendant, whereupon the case was continued to May 30, 1990. Thereafter, the case was continued three more times.

On August 20, 1990, defendant filed a motion for substitution of judge (SOJ) for cause. On August 28, 1990, the chief judge assigned the case to Judge Kelley for a hearing on the SOJ motion. The case was then continued on September 4 and September 14, 1990. On September 18, 1990, Judge Kelley heard and denied the SOJ motion and ordered that the case be transferred back to Judge Bailey.

Defendant also filed a motion to quash his arrest and suppress

evidence on September 18, 1990. The case was then continued on October 12 and October 19, 1990. The motion was ultimately heard by Judge Bailey on October 26, 1990.

Defendant called police officers Dominick Cannova, Robert Navigato and Detective Lawrence Tuider to testify at the suppression hearing; defendant also testified on his own behalf. The police personnel testified that on May 29, 1985, Detective Tuider asked Officer Navigato and his partners to find defendant and bring him in for an interview. Detective Tuider did not think he told Officer Navigato to arrest defendant. Tuider also testified that there were no arrest warrants for defendant at that time; there was a stop order regarding "a traffic charge or something." Detective Tuider wanted to interview defendant because he had information that defendant had been in the hallway of Ms. Easton's building at approximately 4 a.m. on May 24, 1985. Detective Tuider had information that defendant had been seen in a drunken and belligerent condition directly across the hall from Ms. Easton's apartment. Detective Tuider also had information that defendant had been employed as a painter in the building and may have had a key for the front entrance of the building, though not for individual apartments. Detective Tuider had further information that defendant had a prior arrest for attacking a woman in a suburb of Chicago.

Police Officer Thomas Cannova testified that on May 29, 1985, he received information that he should talk to the defendant regarding a battery. Officer Cannova went to defendant's third-floor apartment at 6253 South Whipple in Chicago at approximately 5:15 p.m. and knocked on the door. Defendant answered the door; Officer Cannova displayed his badge, introduced himself, told defendant that the police were conducting an investigation regarding a battery of a young woman and asked whether defendant would mind coming to Area 3 for an interview. Defendant notes that Officer Cannova testified that he told defendant that defendant was "needed for questioning" at the first trial. Defendant asked if he had to come to the police station to which Officer Cannova responded that he did not, "but if he didn't have anything to worry about, why wouldn't he come." Defendant agreed to accompany Officer Cannova and the officer gave defendant his *Miranda* rights as they walked downstairs. Officer Cannova further stated that he did not have his gun out, handcuff the defendant or place defendant under arrest. Officers Cannova and Navigato, along with a third officer, Officer Delia, then transported defendant to the police station in their squad car. Officer Cannova testified that when he spoke to defendant at the apartment, Officer Navigato had remained in the squad car and Officer Delia had been on another floor of the apartment building.

Officer Cannova admitted that a police report bearing his name indicated that defendant had been taken into custody at approximately 5:15 p.m. on May 29, 1985. However, Officer Cannova denied that the signature on the report was his signature.

Officer Navigato gave testimony that was largely similar to the account provided by Officer Cannova. Officer Navigato also admitted that a police report bearing his name indicated that at approximately 5:10 p.m. on May 29, 1985, the officers went to defendant's home and took him into custody. Officer Navigato further testified that the report was prepared on June 1, 1985, after defendant had been charged, that defendant had come in to the station voluntarily and that the report contained "an unfortunate selection of words" on his part. Officer Navigato stated that defendant was turned over to Detective Tuider at the police station.

Detective Tuider testified that he spoke with defendant in an interview room between 5 and 6 p.m. on May 29, 1985. Detective Tuider testified that defendant was not handcuffed and never asked to make a phone call or talk to an attorney. After reading defendant the *Miranda* warnings and ascertaining that defendant understood them, Detective Tuider asked defendant about his whereabouts on the evening of May 23 and early morning of May 24, 1985. Defendant responded that he had been out drinking for a while. Detective Tuider testified that defendant eventually gave an oral statement to an assistant State's Attorney at approximately 11:30 p.m. and a written statement at approximately 1 a.m. on May 30, 1985.

We note that Detective Tuider testified at trial that he had also taken defendant's fingerprints. Detective Tuider testified that defendant asked to speak to a State's Attorney after Detective Tuider informed the defendant that the police had found fingerprints on the bathroom door of Ms. Easton's apartment.

Defendant offered a different version of the events of May 29, 1985, at his suppression hearing. Defendant testified that upon answering a knock at his door, defendant was faced with Officer Cannova, who was standing with a gun in his hand. According to defendant, Officer Cannova pointed the gun at defendant's head and ordered him to get down on his knees. Defendant complied with this order and then lay face down on the floor at Officer Cannova's insistence. Officer Cannova and another officer searched defendant while he was on the floor, then handcuffed him, removed him from the building and took him to the police station.

Defendant testified that he was taken upstairs, where Detective Tuider took him into an interrogation room. Defendant testified that he was then handcuffed to the wall. Defendant also testified that his

request to speak to an attorney was denied. Defendant further testified that he did not have any traffic problem pending at the time of his arrest.

The trial court denied defendant's motion to quash and suppress, indicating that the motion turned on the credibility of the witnesses. The case was then continued to the prospective trial date of December 11, 1990. The case was then continued twice more until February 19, 1991, when the half-sheet indicates Judge Grossi as the judge on the case. The case was continued a number of times thereafter, during which time defendant moved to be discharged pursuant to the section 103—5(a) of the Code of Criminal Procedure of 1963 (Speedy Trial Act) (Ill. Rev. Stat. 1991, ch. 38, par. 103—5(a)). Defendant's motion for discharge was denied on October 23, 1991. Jury selection commenced on November 4, 1991.

As noted above, the facts elicited in the jury trial were sufficiently similar to those presented in the prior bench trial. In sum, the record shows that Karen Easton was discovered lying naked in a pool of her own waste in the bedroom of her apartment by her sister and her boyfriend. Easton died days later at the hospital; the cause of death was determined to be strangulation. A witness placed defendant outside Easton's apartment hours after her boyfriend had left the apartment and before he returned the day Easton was discovered. The jury was read defendant's statement, in which he admitted to entering her apartment, "coming on to her," chasing her to her bathroom, breaking down the bathroom door, grabbing Easton by her neck and bringing her into her bedroom. Following closing argument and deliberations, the jury found defendant guilty of murder, home invasion and attempted aggravated sexual assault.

Defendant filed a motion for a new trial, which was denied by the trial court on December 13, 1991. The trial court then heard arguments in aggravation and mitigation of sentencing. At the sentencing hearing, the State produced a facsimile copy of a 31-page report from the Department of Naval Investigative Service showing defendant's disciplinary record while in the Navy. Defendant objected to the introduction of the report. The State explained that the Chicago Bureau of Investigation report on defendant showed that a Maryland assault charge had been referred to military authorities. The Navy records indicated that defendant pleaded guilty to assault and battery charges and was sentenced to 18 months imprisonment in Maryland facilities. The State maintained that the inaccuracy of the Chicago Bureau of Investigation report delayed the State's inquiry into the Maryland charge and further represented that the Navy provided the facsimile copy because it could not produce the official

records in less than six months. Ultimately, the trial court admitted the portion of the Navy facsimile report regarding the Maryland charge, but excluded other portions of the report regarding admissions defendant allegedly made to Navy authorities regarding other incidents.

The trial court found defendant eligible for an extended-term sentence on the ground that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty; thus, defendant was sentenced to 80 years' imprisonment. Defendant now appeals his conviction and sentence.

# I

Defendant's first argument on appeal is that the trial court erred in denying his motion for substitution of judge. Section 114—5(d) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 114—5(d)) provides that a defendant may move at any time for a substitution of judges for cause. Defendant has waived this issue on appeal because he did not raise it in his post-trial motion as trial error. See, *e.g.*, *People v. Wade* (1987), 116 Ill. 2d 1, 9, 506 N.E.2d 954, 957.

Nevertheless, we may consider defendant's argument under the plain error rule (134 Ill. 2d R. 615(a)) where the evidence is closely balanced or the error of such constitutional magnitude that defendant was denied a fair trial. (*People v. Speight* (1992), 153 Ill. 2d 365, 379, 606 N.E.2d 1174, 1180.) Bias in a judge is one of the few trial errors that may not be deemed harmless; moreover, the waiver rule is applied less rigidly where the conduct of the trial judge is the basis for the appeal. See *People v. Jackson* (1993), 250 Ill. App. 3d 192, 202, 620 N.E.2d 1239, 1246.

■ First, defendant alleged that Judge Bailey had predetermined that defendant would receive an 80-year sentence before defendant's first trial. Our supreme court has repeatedly stated that a motion to transfer a case to a new judge, due to the alleged prejudice of the assigned judge, must be made at the earliest practical moment after any potential prejudice is discovered. (*E.g.*, *People v. Taylor* (1984), 101 Ill. 2d 508, 518, 463 N.E.2d 705, 710.) In this case, the motion for SOJ was filed more than four years after the comment was made, approximately six months after the case was redocketed and more than three months after private defense counsel filed his appearance.

Second, defendant alleged that after the remand, Judge Bailey had stated that the defendant was guilty of committing a heinous rape and murder. A trial judge who expresses the opinion that the defendant is guilty of an offense before hearing any evidence may be disqualified from sitting at trial. (See *People v. Robinson* (1974), 18

Ill. App. 3d 804, 807-08, 310 N.E.2d 652, 655-56.) In this case, Judge Bailey had heard evidence against defendant and found him guilty of murder following the first trial. As with defendant's first allegation, defendant and defense counsel were aware that Judge Bailey had held that opinion for months (at least) before filing a motion for SOJ.

Defendant notes that he was never charged with rape, let alone convicted of that offense or the successor offense of aggravated criminal sexual assault. In the transcript of the hearing on the SOJ motion, Judge Kelley states that the statement at issue "appears in open court with the benefit of having heard evidence in this trial." Defendant has failed to identify where Judge Bailey made this statement in the record on appeal. Thus, this court is unable to determine whether Judge Bailey made the statement as alleged in the motion for SOJ or the context in which such a statement may have appeared. Consequently, this court may presume that Judge Kelley ruled correctly. See *People v. Majer* (1985), 131 Ill. App. 3d 80, 84, 475 N.E.2d 269, 271.

Third, defendant alleges that after the remand, Judge Bailey stated that he might permit the State to seek the death penalty on retrial. Defendant claims that this would be contrary to section 5—5—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—4), which governs resentencing on remand.

The record indicates that Judge Bailey commented that this matter was "a capital case" while discussing who would represent defendant on remand; in context, the comment could be interpreted as expressing concern that defendant be adequately represented, particularly on remand due to ineffective assistance of counsel. However, assuming *arguendo* not only that Judge Bailey meant to permit the State to seek the death penalty, but also that such resentencing would be contrary to statute in this case, defendant cites no authority for the proposition that a misinterpretation of the sentencing statute is evidence of actual hostility to this defendant.

## II

Defendant next contends that the trial court erred in denying his motion to quash the arrest and suppress evidence. Defendant's motion alleged that he was arrested without probable cause "at or near 6253 S. Whipple, Chicago, Illinois," and that he was later "searched, photographed, fingerprinted and otherwise processed, questioned and exhibited by the police." In determining whether an arrest has taken place, the question is whether a reasonable innocent person in the defendant's situation would have considered himself free to leave. (See *People v. Reynolds* (1983), 94 Ill. 2d 160, 165, 445 N.E.2d 766,

768.) It is the function of the trial court to determine the credibility of the testifying witnesses. (*People v. Redd* (1990), 135 Ill. 2d 252, 268, 553 N.E.2d 316, 322.) This court will not reverse the trial court's decision on a motion to quash arrest unless that finding is manifestly erroneous. *People v. Buie* (1992), 238 Ill. App. 3d 260, 268, 606 N.E.2d 279, 284.

■ In this case, defendant argued that he was arrested at his home. The trial court, however, accepted the testimony of the police witnesses who testified that defendant voluntarily accompanied them to the station. As in cases such as *Buie*, we conclude that the trial court's ruling was not manifestly erroneous. *Buie*, 238 Ill. App. 3d at 268, 606 N.E.2d at 284.

Defendant argues in the alternative that he was arrested after he accompanied the police to the police station, but before he gave an inculpatory statement. The record shows that defendant made this claim in passing during closing argument on his motion, but did not make this claim in the motion itself and made no specific reference to this argument in his post-trial motion. Thus, this court may deem the argument waived on appeal. *E.g., People v. Hassan* (1993), 253 Ill. App. 3d 558, 566, 624 N.E.2d 1330, 1336.

Nor is this a case of plain error. The factual scenario described by the police witnesses is substantially similar to the scenario presented in *People v. Collins* (1989), 182 Ill. App. 3d 362, 538 N.E.2d 781. In *Collins*, the defendant voluntarily went to the police station twice and agreed to be fingerprinted and photographed. (See *Collins*, 182 Ill. App. 3d at 363, 538 N.E.2d at 782.) Collins, who was read his *Miranda* rights, gave inculpatory statements hours later, after being confronted with the fruits of the ongoing police investigation, including the results of fingerprint analysis. (See *Collins*, 182 Ill. App. 3d at 363-64, 538 N.E.2d at 782.) This court upheld the decision of the trial court denying Collins' motion to suppress. (*Collins*, 182 Ill. App. 3d at 365, 538 N.E.2d at 783.) Similarly, the determination that defendant was not arrested until he gave an inculpatory statement was not manifestly erroneous in this case.

### III

Defendant contends that the trial court erred in denying his motion for discharge pursuant to the Speedy Trial Act, which provides that "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant." (Ill. Rev. Stat. 1991, ch. 38, par. 103—5(a).) In this case, defendant was tried and his conviction reversed and remanded for a

new trial. When a defendant prevails in an Illinois court of review, a mandate issues which, when properly docketed, commences the running of the 120-day term. (*People v. Worley* (1970), 45 Ill. 2d 96, 98, 256 N.E.2d 751, 752.) Thus, defendant should have been tried within 120 days of February 26, 1990.

Defendant claims here that 144 days that were not chargeable to defendant elapsed before his retrial. The largest single continuance that defendant argues was not chargeable to his own delay was a 46-day continuance granted from October 26, 1990, to December 11, 1990. The transcript of proceedings for October 26, 1990, shows that at the conclusion of the hearing on defendant's motion to suppress, the following discussion occurred:

"THE COURT: *** Let's go. Any other motions or what do you want to do?

MR. WALSH [Defense counsel]: At this point, Judge, I think the case should be set for trial.

THE COURT: Sure. I would like to try it this year. How about December 10.

MR. WALSH: Unfortunately that day I have a matter set for trial in Juvenile Court before Judge Morgan on a matter that has run its term.

THE COURT: How about the 11th?

MR. WALSH: Assuming we finish it.

THE COURT: Sure. Why don't we try it. 12-11."

The parties dispute whether these statements constitute an agreement to a continuance. Delay will not be attributed to the defendant on the basis of a silent record or if defendant fails to object to the State's request for a continuance. (*People v. Turner* (1989), 128 Ill. 2d 540, 553, 539 N.E.2d 1196, 1201.) However, an express agreement to a continuance on the record is an affirmative act attributable to the defendant. (*Turner*, 128 Ill. 2d at 553, 539 N.E.2d at 1201.) Defendant argues that the discussion is a mere agreement to a date ordered by the court, not an agreement by the defendant to a delay of the trial. (See *People v. Beyah* (1977), 67 Ill. 2d 423, 367 N.E.2d 1334.) The decision of the trial court as to accountability for delay in bringing the defendant to trial should be sustained, absent a clear abuse of discretion. *Turner*, 128 Ill. 2d at 551, 539 N.E.2d at 1199.

■ Given the record on appeal, it would appear that this case falls closer to *Turner*, in which a continuance was charged to the defendant, than the cases cited by the defendant here. This is not a case like *People v. Hawkins* (1991), 212 Ill. App. 3d 973, 983-84, 571 N.E.2d 1049, 1056, in which defense counsel sought an earlier trial date and the court indicated more than once that its crowded docket

precluded an earlier trial date. (See also *Beyah*, 67 Ill. 2d at 428, 367 N.E.2d at 1336 (trial court recommended a date and refused defense request for an earlier date).) Indeed, the trial court noted here that it was the trial court that sought to try the case earlier and defendant who agreed to a later date "assuming we finish it." Nor is this a case like *People v. Smith* (1991), 207 Ill. App. 3d 1072, 1077, 566 N.E.2d 797, 800, in which defense counsel stated "fine" to a date suggested by the State; the trial court found that statement was not an agreement to delay. Instead, the trial court in this case found the delay attributable to defendant.

In sum, the trial court did not abuse its discretion in charging the 46-day continuance to defendant. As this determination leaves fewer than 120 days in dispute, we conclude that defendant has failed to show his motion for discharge should have been granted.

## IV

Defendant also claims four sentencing errors. Defendant first claims that the trial court erred in considering a portion of the facsimile Navy records and "bare arrests" in determining his sentence. A sentencing court has great latitude in determining the types and sources of information that will be admitted to assist in determining a sentence imposed within the statutory limits; evidence may be admitted where it is deemed relevant and reliable, and that decision is within the discretion of the sentencing court. (*People v. Tigner* (1990), 194 Ill. App. 3d 600, 607, 551 N.E.2d 304, 308.) Hearsay testimony is not *per se* inadmissible at a sentencing hearing as unreliable or as denying a defendant's right to confront accusers. *People v. Foster* (1987), 119 Ill. 2d 69, 98, 518 N.E.2d 82, 94.

Defendant notes that the portion of the facsimile Navy records concerning the Maryland assault and battery conviction is *double* hearsay. Generally, where our supreme court has approved the admission of double hearsay, at least some parts of the double hearsay have been corroborated by other evidence. (*Foster*, 119 Ill. 2d at 98, 518 N.E.2d at 95.) However, the *Foster* court also stated that uncorroborated double hearsay testimony is not inherently unreliable and can be admitted where the information was compiled during an official investigation and was not directly challenged. *Foster*, 119 Ill. 2d at 98-99, 518 N.E.2d at 95.

In this case, most of the information in the portion of the facsimile Navy records admitted by the trial court was partially corroborated. For example, the biographical information (*e.g.,* name, social security number, birth date and birthplace) matches the biographical information contained in the other presentencing

materials. In addition, the presentencing materials indicate that defendant was charged with assault and battery in Maryland on February 1, 1977. The difference between the contested document and the standard presentencing materials is in the disposition of the charge. However, the standard presentencing materials also indicate that verification of defendant's military history had not been received at the time the presentencing report was prepared. Moreover, as in *Foster* (and the cases cited therein), defendant never directly attacked the truth of the matter asserted in the document at issue. Given these circumstances, the trial court did not abuse its discretion in admitting the document.

As for the evidence of the "bare arrests," the sentencing court may consider evidence of misconduct for which no prosecution or conviction ensued, provided that evidence is both relevant and reliable. (*People v. Richardson* (1988), 123 Ill. 2d 322, 361, 528 N.E.2d 612, 628.) Absent evidence of reliability, however, the consideration of a mere arrest is prejudicial error (see *People v. Wallace* (1986), 145 Ill. App. 3d 247, 256, 495 N.E.2d 665, 670), unless the record demonstrates that the weight placed on the improper factor by the court was insignificant. See *People v. Bourke* (1983), 96 Ill. 2d 327, 332-33, 449 N.E.2d 1338, 1340.

In this case, the transcript of the sentencing hearing indicates that defendant objected to the State's argument, which offered details of prior arrest incidents that are not in the presentencing investigation report. Defendant did not object to the admission of the fact of the arrests themselves. Thus, defendant has waived the objection on appeal. *People v. Hudson* (1993), 157 Ill. 2d 401, 459, 626 N.E.2d 161, 187.

◼ Nor would the admission of the arrests appear to be plain error in this case. Defendant notes that the trial court noted "the defendant's history of violence as reflected in the presentence investigation." However, the presentencing report showed that defendant received probation for battery on April 20, 1980, and the facsimile Navy document showed that defendant pleaded guilty to battery in 1978. In addition, the trial court expressly excluded other charges made in other portions of the facsimile documents. Thus, the trial court could have properly concluded defendant had a history of violence without consideration of the "bare arrests."

Second, defendant asserts that he was given ineffective assistance of counsel where defense counsel failed to tender a memorandum in mitigation that had been presented on defendant's behalf at the first trial. A failure to present mitigating evidence at a sentencing hearing by defense counsel may result in a remand for resentencing. (See,

*e.g., People v. Perez* (1992), 148 Ill. 2d 168, 185-86, 592 N.E.2d 984, 993.) However, such a failure does not in itself prove that a defense attorney was ineffective. (See *Perez*, 148 Ill. 2d at 186, 592 N.E.2d at 993.) In some cases, such evidence may be flawed or so prejudicial that competent counsel would make a strategic choice not to present it. *Perez*, 148 Ill. 2d at 186, 592 N.E.2d at 993.

In this case, defense counsel failed to tender the previously prepared memorandum in mitigation, which indicated that defendant had an alcohol abuse problem dating from his teenage years and that he had sought treatment on four occasions, only to revert to his old ways after each period of treatment. The presentencing report indicated that defendant stated that he had a drinking problem but had never been treated for alcoholism. The report was also corrected to show that defendant had stated that he was under the influence of alcohol at the time of the offense.

■ Defendant has failed to show from this record the source of the information in the memorandum of mitigation or that the information is reliable. Assuming *arguendo* that the information in the memorandum is accurate on this point, defendant has failed to show that this information would have likely resulted in a lesser sentence. Defendant's reversion to alcohol abuse following each instance of treatment might well have suggested to the trial court that defendant's potential for rehabilitation was lower. Defense counsel may well have made a strategic choice not to tender the memorandum in mitigation.

Third, defendant argues his offense was the product of chronic alcoholism, rather than wanton cruelty. In general, the sentencing decision of the trial court is entitled to great weight and deference. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884.) This court has previously affirmed extended-term sentences based on exceptionally brutal or heinous behavior indicative of wanton cruelty where the defendant was an addict, intoxicated at the time of the offense, or both. *E.g., People v. Hatfield* (1994), 257 Ill. App. 3d 707, 710, 630 N.E.2d 463, 465.

■ In this case, the record shows that defendant entered Karen Easton's apartment, chased her to her bathroom, broke down the door, and dragged her into her bedroom by the neck. Gary Amos and Carol Dirschle discovered Easton naked, lying in her own waste and gasping for breath. Amos testified that Easton's "forehead was crushed in like someone took a golf ball and pushed it into [her] skull." Dirschle testified that she thought Easton's throat had been slashed because it was so red; Dr. Stein testified the red marks were made by fingers. Given this record, the trial court did not abuse its discretion in sentencing defendant to 80 years' imprisonment.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY, J., concurs.

JUSTICE WOLFSON, dissenting:
Custodial interrogation on less than probable cause violates the fourth amendment, whether or not the technical trappings of a formal arrest exist. *People v. R.B.* (1992), 232 Ill. App. 3d 583, 589, 597 N.E.2d 879.

Given the trial judge's findings of fact, curious as they may be, I agree with the majority's conclusion that the defendant was not formally arrested at his home. Still, there are facts surrounding the invitation to be interrogated that must be considered before abandoning this important constitutional question.

Two police officers located the defendant at his home. They had been told by the investigating officer to find the defendant and bring him to the station for questioning. They did not question the defendant at his home. When the defendant agreed to go with them, the officers gave him *Miranda* warnings as they walked down the stairs. Their report stated that the defendant was taken "into custody" at his home at about 5:10 p.m. One officer said his signature to the report was forged. The other said he misspoke when he used the word "custody." The defendant was taken to the police station in a squad car.

Once at the station, the defendant was placed in an interview room. He was turned over to Detective Tuider. At that point, Tuider knew Williams had been in the hallway of the victim's building in the early morning hours of May 24 and he knew Williams had been drinking that night. Tuider gave the defendant *Miranda* warnings for a second time. The questioning began sometime between 5:30 p.m. and 6 p.m.

After some initial questioning, Tuider brought the mobile crime lab in to take Williams' finger and palm prints. The detective asked for and received permission to search the defendant's apartment. Tuider then left the station for Williams' home, leaving the defendant alone in the interview room. At that point, Detective Tuider testified, Williams was "not free to leave." Once Williams arrived at the police station, he never was told he was free to leave.

The investigation continued while Williams sat in the interview room. More questions were asked. At some point between midnight

and 1 a.m., the defendant made incriminating statements to an assistant State's Attorney, oral and written. The first statement came, according to best estimates, seven to eight hours after Williams was asked by police officers to go to the station. Until the first incriminating statement, there was no probable cause to arrest the defendant.

In my view this was the kind of unlawful custodial interrogation condemned in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, and *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103. If Williams voluntarily accompanied the police to the station, his presence there escalated to an involuntary custodial detention at some point before the first incriminating statement was made. See *People v. R.B.* (1992), 232 Ill. App. 3d 583, 597 N.E.2d 879; *People v. Hardway* (1987), 163 Ill. App. 3d 596, 516 N.E.2d 830.

The controlling question is whether a reasonable person, in view of all the circumstances surrounding the incident, would have believed that he was not free to leave. (*Townes*, 91 Ill. 2d at 37.) Here, as in *Townes* and *Dunaway*, and unlike *People v. Collins* (1989), 182 Ill. App. 3d 362, 538 N.E.2d 781, the police officers were interrogating Williams in the hope of obtaining enough information to establish probable cause for an arrest. That kind of official misconduct violates the fourth amendment.

The majority believes the defendant has waived his claim that a lawful detention turned unlawful at some point in the police station before the first incriminating statement. That is not a fair characterization of what happened in the trial court.

In his motion to quash arrest and suppress evidence the defendant repeatedly referred to his "arrest and subsequent detention." Paragraph 9 of the motion said: "During the arrest and subsequent detention, verbal and written statements were obtained from the defendant, the detention having provided the police with the forum for interrogation."

During argument on the motion, defense counsel cited *People v. Gordon* (1990), 198 Ill. App. 3d 791, 556 N.E.2d 573, as a case where the "facts fit almost exactly." *Gordon* is a case where prolonged custodial questioning without probable cause was held to be a violation of the fourth amendment.

After citing *Gordon*, defense counsel argued:

> "Without probable cause, without warrant, *and his being detained for the number of hours he was in the police station, I suggest there was an arrest.* It was an illegal arrest in violation of the Fourth Amendment, that the arrest must be quashed and any evidence obtained from it must also be suppressed." (Emphasis added.)

I do not believe the unlawful custodial questioning point was waived. Even if it was, the trial judge necessarily decided the issue. If he was wrong, a case of plain error is created.

I would find that the defendant's fourth amendment rights were violated because the record shows the police conduct contains the "quality of purposefulness" denounced in *Dunaway v. New York* (1979), 442 U.S. 200, 218, 60 L. Ed. 2d 824, 839, 99 S. Ct. 2248, 2259.